IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | |
| | § | NO.  4:20-CR-358 ALM/KPJ |
| NEERAJ JINDAL (1) | § | |
| JOHN RODGERS (2) | § | |

## DEFENDANT NEERAJ JINDAL'S MOTION TO DISMISS COUNT ONE OF THE FIRST SUPERSEDING INDICTMENT

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION & STATEMENT OF ISSUES ............................................................1

II.    FACTUAL ALLEGATIONS ............................................................2

III.    LEGAL STANDARD............................................................3

IV.    THE INDICTMENT DOES NOT IDENTIFY A *PER SE* SHERMAN ACT VIOLATION AND, AS A RESULT, FAILS TO ALLEGE ESSENTIAL ELEMENTS OF THE CRIME CHARGED........................................................4

    A.    There is Insufficient Judicial Experience with Wage Fixing to Justify a *Per Se* Designation........................................................7

    B.    The Indictment Does Not Allege a Price-Fixing Agreement, Despite the Government's Use of the Phrase........................................................10

    C.    The Failure to Allege a *per se* Violation Requires that the Court Dismiss the Indictment with Prejudice. ........................................................12

V.    THE UNPRECEDENTED INDICTMENT VIOLATES DUE PROCESS........................................................13

    A.    Jindal Did Not Receive "Fair Warning" the Alleged Conduct was Criminal. ........................................................14

    B.    The Indictment's *Per Se* Designation Improperly Promotes Presumption of Intent. ........................................................18

VI.    CONCLUSION........................................................19

Pursuant to Federal Rule of Criminal Procedure 12(b)(3), Defendant Neeraj Jindal ("Jindal") files this Motion to Dismiss Count One of the First Superseding Indictment, requesting that the Court dismiss Count One of the First Superseding Indictment for failure to state an offense.

## I.    INTRODUCTION & STATEMENT OF ISSUES

With Count One of the First Superseding Indictment (the "Indictment"), the government has taken the unprecedented step of bringing a criminal prosecution for an alleged agreement among employers to set wages for contractors.  In doing so, the government has usurped the role of Congress and the courts by bringing criminal charges against Jindal under Section 1 of the Sherman Act for conduct that neither Congress nor the federal courts have *ever* declared or found to be criminal under the Sherman Act.  The government also betrays its own long-held and professed policy of limiting criminal prosecution to conduct that constitutes a *per se* violation of the Sherman Act—*i.e.*, conduct that extensive judicial experience has proven to be inherently "pernicious" and patently anticompetitive.

In more than a century, courts have affixed the *per se* label to only four categories of Sherman Act violations: (1) price fixing, (2) bid rigging, (3) market allocation, and (4) certain types of group boycotts.  Horizontal agreements to fix wages have not been classified as *per se* violations and have not, until now, served as the basis for a criminal prosecution.  There is insufficient judicial experience with wage-fixing agreements for this Court to be the first to designate them as *per se* violations that can serve as the basis of a criminal prosecution.  Wage fixing is not a *per se* violation of the Sherman Act and, for that reason alone, Count One must be dismissed as a matter of law at the threshold because it fails to state a *per se* offense.

Prosecution of Count One also violates fundamental principles of due process and fair notice.  Applying the *per se* rule in this criminal case, in the absence of the judicial experience required to affix the *per se* label onto conduct, deprives Jindal of his Constitutional right to receive

fair notice of what the law prohibits.  For this reason too, Count One of the Indictment must be dismissed.

## II.      FACTUAL ALLEGATIONS

Jindal owned a therapist staffing company that contracted with physical therapists ("PTs") and physical therapist assistants ("PTAs") to provide in-home physical therapy services to patients in the Dallas-Fort Worth Metroplex.  Ind. at ¶¶ 5, 7.  The PTs and PTAs who contracted with Jindal's company were paid wages referred to as a "pay rate" for the home physical therapy services they provided.  *Id.* at ¶ 7.  Jindal's company also billed home health agencies ("HHAs") for the services the PTs and PTAs provided.  *Id.*

The Indictment alleges that John Rodgers ("Rodgers"), a PT who contracted with Jindal's company, contacted via text message the owner of a competing staffing company, Individual 2, "regarding the rates" charged by Jindal's staffing company and Individual 2's staffing company. *Id.* at ¶¶ 6, 12(a).  The government further alleges Rodgers did so "acting on behalf of Jindal."  *Id.* at ¶ 12(a).  The government does **not** allege, however, that Jindal directed Rodgers to reach an agreement with Individual 2 regarding rates.  During the text exchange, Rodgers texted to Individual 2, "I think we're going to lower PTA rates to $45," to which Individual 2 allegedly responded, "Yes I agree," "I'll do it with u," "I think the PT's need to go back to 60 . . . . Our margins are disappearing."  *Id.*  The government alleges that Rodgers subsequently reported this conversation to Jindal.  *Id.*

The Indictment goes on to allege that, following the text exchange between Rodgers and Individual 2, Jindal texted the owners of other therapist staffing companies to recruit additional competitors to join an allegedly collective effort to reduce rates.  *Id.* at ¶ 12(b).  The Indictment quotes alleged text messages to Individual 3, Individual 4, Individual 5, and Individual 6, each of whom owned separate therapist staffing companies, in which Jindal wrote, "I am reaching out to

my counterparts about lowering PTA pay rates to $45.   What are your thoughts if we all collectively do it together?"  *Id.*

The Indictment references another alleged text exchange between Rodgers and Individual 2, in which Rodgers stated, "FYI we made rate changes effective next payroll Monday decreasing PT's and PTA's."  *Id.* at ¶ 12(c).  Individual 2 texted in response, "Well I can join in where did u go."  *Id.*  The Indictment does not include any response from Rodgers providing the anticipated new rates.

The Indictment further alleges that "[p]ursuant to the agreement," Jindal's company "thereafter paid lower rates to certain PTs and PTAs."  *Id.* at ¶ 12(d).  The Indictment does not allege, however, the amount to which Jindal's company lowered the rates.  Nor does the Indictment allege that rates were lowered for PTs or PTAs who contracted with the therapist staffing companies owned by any of Jindal's competitors, including Individual 2, Individual 3, Individual 4, Individual 5, or Individual 6.

## III.    LEGAL STANDARD

An indictment must include "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  This requires the indictment to "state each element of the charged crime and allege that the defendant's conduct met each of those elements."  *United States v. Suarez*, 966 F.3d 376, 382 (5th Cir. 2020).  A court must dismiss an indictment that fails to do so.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).

 Moreover, where the indictment articulates a particular theory of liability under a broadly-worded statute, it must allege all elements of that chosen theory.  *See, e.g.*, *United States v. Shellef*, 507 F.3d 82, 107-09 (2d Cir. 2007) (where indictment alleged "no-sale" theory of wire fraud, failure to allege a discrepancy between benefits anticipated and benefits received under the

identified contract rendered the charge insufficient).  An indictment that does not satisfy these requirements violates the Fifth and Sixth Amendments of the Constitution and must be dismissed. *Russell v. United States*, 369 U.S. 749, 760-61 (1962).

The question of whether to apply the *per se* rule or the rule of reason for an alleged antitrust violation is a question of law.  *See, e.g.*, *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 337 n.3, 354 (1982); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015).  To the extent a criminal indictment does not allege the elements of a rule-of-reason offense (market power, intent, anticompetitive effect, etc.), but instead alleges a *per se* offense, it must be dismissed if it fails to state a cognizable *per se* offense under the Sherman Act.[1]

## IV. THE INDICTMENT DOES NOT IDENTIFY A *PER SE* SHERMAN ACT VIOLATION AND, AS A RESULT, FAILS TO ALLEGE ESSENTIAL ELEMENTS OF THE CRIME CHARGED.

Section 1 of the Sherman Act, which authorizes both civil and criminal prosecutions of antitrust violations, renders "illegal" every agreement "in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  Given the facially broad framing of the statute, both civil and criminal courts avoid a literal approach to the statute, with the Supreme Court recognizing that "Congress intended to outlaw only *unreasonable* restraints."  *Texaco Inv. v. Dagher*, 547 U.S. 1, 5 (2006) (emphasis in original).

For this reason, courts reviewing Section 1 claims "presumptively appl[y] rule of reason analysis," which requires the fact finder to consider a variety of factors to determine whether the particular questioned practice imposes an unreasonable restraint on competition.  *Id.*; *State Oil Co.*

---

[1] That question of whether the Indictment states a cognizable *per se*  offense is critical to answer as early as possible, for whether conduct is subject to the *per se* rule or the rule of reason has considerable implications for how a case proceeds.  If the Court grants the motion, the government may seek immediate appellate review under 18 U.S.C. §3731.  Conversely, if the Court denies the motion, Jindal will be forced to defend himself at trial against this unprecedented *per se* theory before he ever obtains further legal review of the novel concept the government has put forth.  Therefore, dismissal is not only legally correct, but also  the best way to avoid expending considerable party and judicial resources on a fundamentally flawed trial.

*v. Khan*, 522 U.S. 3, 10 (1997).  The rule of reason requires the plaintiff to "demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive."  *Dagher*, 547 U.S. at 5.  In determining whether the conduct is unreasonable, the rule of reason requires consideration of "all of the circumstances," including "specific information about the relevant business," "the restraint's history, nature, and effect," "[w]hether the businesses involved have market power," and the "actual effect" of the challenged restraint on the relevant market.  *Leegin Creative Leather Prods. Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-86 (2007).

The Supreme Court has determined that a few, limited restraints "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*."  *State Oil Co*., 522 U.S. at 10.  These exceptional restraints "'are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."  *Nw. Wholesale Stationers v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 289 (1985) (internal quotations and citations omitted).  The consequences that follow p*er se* treatment are unforgiving—the conduct is deemed *per se* illegal, without any need to consider intent, market power, or any pro-competitive justifications.  *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210-11 (1940).  Therefore, the Supreme Court has reserved *per se* classification for only a narrow class of restraints, finding that "*per se* rules are appropriate only for 'conduct that is manifestly anticompetitive.'"  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977)); *see also Dagher*, 547 U.S. at 5 ("*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'"  (quoting *Nat'l Soc'y of Prof. Engineers v. United States*, 435 U.S. 679, 692 (1978))).  Such conduct must also have a

"pernicious effect on competition and lack . . . any redeeming virtue." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958).

This exacting standard for application of the *per se* label means that, in the long history of the Sherman Act, courts have limited designating conduct as *per se* violations of Section 1 to four categories of agreements between competitors:  price fixing, market allocation, bid rigging, and certain types of group boycotts.  *See, e.g.*, *Dagher*, 547 U.S. at 5 (price fixing); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990) (market allocation); *United States v. Rose*, 449 F.3d 627, 630 (5th Cir. 2006) (bid rigging); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (group boycotts "involving horizontal agreements among direct competitors").  However, even conduct that fits within these recognized categories of agreements does not always merit a *per se* label if the conduct is not plainly anticompetitive.  *See In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012) ("[E]ven price fixing . . . [is] governed by the rule of reason . . . if the challenged practice when adopted could reasonably have been believed to promote" potentially legitimate outcomes).

Thus, when considering if charged conduct states a *per se* offense, the labels applied by the government do not dictate the classification.  Instead, the departure from the rule of reason presumption to a *per se* classification "must be based upon demonstrable economic effect rather than . . . formalistic line drawing." *Continental T.V., Inc.*, 433 U.S. at 58-59.  That determination is an issue of law for the court.  *MM Steel, L.P.*, 806 F.3d at 847.

As explained below, the Supreme Court has "been cautious in extending the per se approach to [new] claims that fall outside certain previously enumerated categories of liability," *Eichorn v. AT&T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001), and has done so only after extensive judicial experience.  That caution takes on even more importance in criminal cases, such as this

one.  This Court should not take the drastic step of expanding the Sherman Act jurisprudence to create a new category of *per se* violations.

> ### A.      There is Insufficient Judicial Experience with Wage Fixing to Justify a *Per Se* Designation.

The Indictment challenges an alleged restraint that no criminal antitrust case has ever scrutinized, much less imposed.  Indeed, neither the Supreme Court nor any Court of Appeals has ever determined whether a purported wage-fixing agreement should be *per se* unlawful under Section 1 of the Sherman Act.  Nor has the Supreme Court or any Court of Appeals analyzed the economic effect of an alleged wage-fixing agreement—much less concluded that the conduct is "manifestly anticompetitive"—as required for *per se* treatment.  *Leegin*, 551 U.S. at 886.  Few district courts have even addressed the question of whether a purported wage-fixing agreement is *per se* unlawful in the civil context, with most doing so in a conclusory manner without evaluating the core issue of whether wage fixing should be viewed as a *per se* violation or adjudicated under the rule of reason.[2]  No court, however, has engaged in the in-depth analysis that would justify a finding that wage-fixing agreements always bear "pernicious and predictable effects" that are "manifestly anticompetitive."  *State Oil Co.*, 522 U.S. at 10; *Leegin*, 551 U.S. at 886.

The paucity of judicial experience with wage-fixing cases, combined with the absence of in-depth judicial analysis to develop a clear understanding of the competitive effects of wage-fixing conduct, dictate that this Court should not classify the alleged wage-fixing conduct as a *per*

---

[2] *See, e.g.*, *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1212-14 (N.D. Cal. 2015) (finding, at the motion to dismiss stage, that the plaintiffs "alleged sufficient facts to support a plausible *per se* claim" where the defendants did not challenge the general designation of wage fixing as a *per se* violation); *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 624-25 (E.D. Mich. 2012) (noting that the plaintiffs and defendants agreed that wage fixing should be characterized as a *per se* violation).  Others have simply accepted that the legal precedent governing price-fixing agreements can apply equally to wage-fixing agreements.  *See, e.g.*, *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 157 (N.D.N.Y. 2010) ("Generally, price-fixing [or in this case wage-fixing] agreements are considered a per se violation of the Sherman Act.") (alterations in original) (internal quotations and citations omitted); *Doe v. Arizona Hosp. and Healthcare Ass'n*, No. CV 07-1292-PHX-SRB, 2009 WL 1423378, at *2-4 (D. Ariz. Mar. 19, 2009) (treating wage fixing the same as buyer-side price fixing in a civil case).

*se* violation of the Sherman Act—and become the first court to do so in a criminal case.  The Supreme Court has "expressed reluctance to adopt *per se* rules . . . 'where the economic impact of certain practices is not immediately obvious.'"  *Dagher*, 547 U.S. at 5; *see also F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458-59 (1986) (recognizing that the Supreme Court has "been slow . . . to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious").

As a result, a restraint in trade may be deemed *per se* unlawful "only after courts have had considerable experience with the type of restraint at issue."  *Leegin*, 551 U.S. at 886; *see also United States v. Topco Assoc.*, 405 U.S. 596, 607-08 (1972) ("It is only after considerable experience with certain business relationships that courts classify them as per se violations . . . ."). Such "considerable experience" with a particular restraint is required so courts can "predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886; *see also Maricopa Cty. Med. Soc'y*, 457 U.S. at 344 (explaining that *per se* treatment is only appropriate "[o]nce experience with a particular kind of restraint enables the [c]ourt to predict with confidence that the rule of reason will condemn it.").

Indeed, this requirement of extensive judicial experience is what justifies the existence of the *per se* rule in the first place.  PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW, §1909b (4th ed. 2020) ("The premise of the *per se* rule is that *judicial* experience with a certain class of restraints justifies a more expedited treatment.").  Conversely, "[w]hen the Courts are uncertain of the competitive significance of a particular type of restraint, they decline to apply the per se label." *United States v. Realty Multi-List., Inc.*, 629 F.2d 1351, 1365 (5th Cir. 1980).  Courts simply have not had the "considerable experience" with purported wage-fixing conduct that is necessary to expand the realm of *per se* conduct, much less to do so in a criminal case.

The need for further judicial experience and analysis is also evident when viewing wage fixing in the broader context of the purpose of the antitrust laws.  As the Federal Trade Commission acknowledges, since the enactment of the Sherman Act in 1890, "the antitrust laws have had the same basic objective: to protect the process of competition *for the benefit of consumers*, making sure there are strong incentives for businesses to operate efficiently, *keep prices down*, and keep quality up."   FTC's Guide to Antitrust Laws, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/antitrust-laws (emphasis added).   Labor, including wages, constitutes a substantial cost for employers and businesses; a cost that businesses pass on to consumers.  An agreement among employers with respect to reducing wages would almost certainly decrease costs to businesses, and could have the ultimate effect of benefitting consumers downstream through lower prices.  Such conduct could not be said to "lack [] any redeeming virtue" such that a *per se* designation is appropriate.  *N. Pac. Ry. Co.*, 356 U.S. at 5.

Nor are the anticompetitive effects of a wage-fixing agreement so obvious that it merits a *per se* designation.  An agreement among competing employers to pay lower wages to contractors will not necessarily have anticompetitive effects, particularly where, as here, the alleged agreement involves only two of many potential employers.  To the contrary, such an agreement would provide an opportunity for rival employers to compete with respect to wages.  *See Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 61 (1st Cir. 2002) ("[S]uppressing player salaries ought to spur, rather than impair, competition from rival leagues.").   In light of the very real possibility that an agreement to fix wages could encourage, rather than discourage, competitors, the anticompetitive effect of an alleged wage-fixing agreement is not so "predictable and pernicious" as to merit a *per se* designation.  *State Oil*, 522 U.S. at 10.

Unlike other conduct that courts have long-deemed *per se* Sherman Act violations, wage-fixing agreements have not undergone the sort of judicial review necessary to warrant their classification as a *per se* offense.  This Court should follow the approach of the Supreme Court by exercising caution, and refrain from expanding the universe of *per se* offenses.  *See White Motor Co. v. United States*, 372 U.S. 253, 263 (1963) ("We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. . . . We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a 'pernicious effect on competition and lack . . . any redeeming virtue' and therefore should be classified as per se violations of the Sherman Act.").

**B.    The Indictment Does Not Allege a Price-Fixing Agreement, Despite the Government's Use of the Phrase.**

In apparent recognition that wage-fixing jurisprudence does not support its classification of the alleged agreement as a *per se* Sherman Act violation, the government goes to great effort to avoid using the phrase "wage fixing" in the Indictment.  Instead, the Indictment repeatedly uses the phrases "price fixing" and "prices" for conduct that does not involve "prices" and cannot constitute "price fixing."   For example, Count One of the Indictment refers to "Antitrust Conspiracy: Price Fixing."  Ind. at pp. 1, 17.  The government proceeds to refer to wages as "prices" and alleges that Jindal "engaged in a conspiracy to suppress competition by agreeing to fix prices." *Id.* at ¶¶ 7, 11.  Simply referring to conduct as "price fixing" does not make it so, and the government's misuse of the terminology reveals the fatal flaw in its case.

The Indictment does not allege any agreement to fix "prices."  *See generally id.*  The only good or service provided by the in-home physical therapy business is the actual physical therapy service provided to patients.  As the Indictment acknowledges, home health agencies billed Jindal's company for providing these services.  *Id.* at ¶ 7.  Jindal, his company, and competitor

10

therapist staffing companies do not set the prices for those therapy services, and the Indictment does not allege any agreement to fix those prices. Any horizontal price-fixing agreements in the in-home physical therapy business necessarily would be among the home health agencies that set the rates for therapy services, not the therapist staffing companies.

At most, the Indictment alleges an agreement to fix **wages**—not between Jindal and a competitor, but between one of Jindal's contract therapists and a competitor. The Indictment states, "[e]ach PT and PTA who contracted with Company A had set *prices* (a "rate" or "pay rate") that Company A paid them for providing in-home care visits." *Id.* at ¶ 7 (emphasis added). A "wage" is "a payment usually of money for labor or services usually according to contract and on an hourly, daily, or piecemeal basis." *Wage*, https://www.merriam-webster.com/dictionary/wage. The Indictment describes a "wage." The "rate" or "pay rate" paid to PTs and PTAs was a payment for labor (*i.e.* providing in-home physical therapy) and was on a "piecemeal basis" for each visit. Thus, the Indictment uses the word "prices" to refer to the pay rates for PTs and PTAs, whereas it should have used the appropriate word: wages.

The government relies upon the subterfuge of labeling "wages" as "prices" to allege that Jindal, Rodgers, and unnamed co-conspirators engaged in a conspiracy by "agreeing to fix prices by lowering the pay rates to PTs and PTAs." The Indictment lacks any allegations that Jindal or his alleged co-conspirators made any agreement to fix prices paid by consumers, or even had the ability to do so. Because the referenced rates paid to PTs and PTAs constituted compensation for their labor, those rates were "wages." Wages do not fall within the definition of "price fixing," which is defined as "fixing . . . the price of a commodity." *Socony-Vacuum Oil Co.*, 310 U.S. at 223-24.

11

The DOJ's own guidance differentiates between "price-fixing" and "wage fixing," defining the conduct separately.  The DOJ defines "prices fixing" as "an agreement among competitors . . . to raise, fix, or otherwise maintain the price at which their products or services are sold."  U.S. DEPT. OF JUSTICE ANTITRUST DIVISION, AN ANTITRUST PRIMER FOR FEDERAL LAW ENFORCEMENT PERSONNEL 3 (2018).  The DOJ separately defines "wage fixing" as "an agreement between employers not to compete on employee salary, benefits, or other terms of compensation, either at specific levels or within a range."  *Id.* at 6.  The conduct alleged in the Indictment clearly falls within the latter definition, not the former.

Despite the phrasing of the Indictment, the government has acknowledged that it is pursuing a "wage fixing" case.  The target letter the government sent to Jindal on July 26, 2019 refers to a "Criminal Wage-Fixing Grand Jury Investigation" "regarding **wages** paid by therapist staffing companies to physical therapists and physical therapists' assistants."  (Ex. A)[3] (emphasis added).

The government cannot simply substitute the word "prices" for "wages" as a means to disguise a wage-fixing case as a price-fixing case.  The efforts by the government to label as "price fixing" what can only be considered "wage fixing" illustrates its own recognition that courts have not afforded wage-fixing allegations the extensive judicial review necessary to classify wage fixing as a *per se* Sherman Act violation.

## C.    The Failure to Allege a *per se* Violation Requires that the Court Dismiss the Indictment with Prejudice.

The government's inability to identify conduct constituting a *per se* violation of the Sherman Act is fatal to Count One because the Indictment fails to allege anticompetitive effects

---

[3] A copy of the target letter is attached hereto as **Exhibit A**.  Jindal respectfully requests that the Court take judicial notice of the letter pursuant to Federal Rule of Evidence 201.

and intent, both of which are essential elements of the offense.  Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."  *Leegin*, 551 U.S. at 885 (internal quotations and citations omitted). The factors to be considered include "specific information about the relevant business"; "the restraint's history, nature, and effect"; and "[w]hether the businesses involved have market power." *Id.* at 885-86 (internal citations omitted). The resulting lack of predictability in what is unlawful would violate Constitutional requirements of clarity and fair warning. *See infra* Part V.

The DOJ's own longstanding policy of not charging antitrust violations based upon a rule of reason theory justifies dismissal.  Thomas O. Barnett, *Antitrust Law & Policy, Criminal Enforcement of Antitrust Laws: The US Model* (Sept. 14, 2006), https://www.justice.gov/atr/speech/criminal-enforcement-antitrust-laws-us-model        ("[T]he division focuses its criminal enforcement only on hard core violations . . . as opposed to the 'rule of reason' . . . analyses used in civil antitrust law . . . ."); *see also* U.S. DEP'T OF JUST., JUST. MANUAL § 7-1.000 (2020), available at https://www.justice.gov/jm/jm-7-1000-policy#7-1.100 ("When it comes to enforcement, the Division's policy, in general, is to proceed by criminal investigation and prosecution in cases involving horizontal, "per se" unlawful agreements such as price fixing, bid rigging, and market allocation.").  Although in this case the DOJ seeks to expand the boundaries of what qualifies as a *per se* violation of the Sherman Act, it has never renounced its policy of prosecuting criminally only those violations that so qualify.

## V.    THE UNPRECEDENTED INDICTMENT VIOLATES DUE PROCESS.

Application of the *per se* rule is unconstitutional in criminal cases because it violates the Fifth and Sixth Amendments of the Constitution.  First, the novel construction of the statute to construe "wage fixing" as *per se* unlawful violates the rule of lenity and fails to give fair warning

of the prohibited conduct.  Second, a *per se* designation improperly promotes a presumption of intent, vitiating the requirement of proof of state of mind in the criminal context.

### A.     Jindal Did Not Receive "Fair Warning" the Alleged Conduct was Criminal.

The Fifth Amendment to the United States Constitution provides in part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . nor be deprived of life, liberty, or property, without due process of law. . . ." Due process requires that "no man shall be criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Lanier*, 520 U.S. 259, 265, (1997) (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)).  The vagueness doctrine bars the enforcement of (1) "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application"; (2) the rule lenity ensures fair warning by resolving ambiguity such that criminal statutes apply "only to conduct clearly covered"; and (3) courts may not apply a criminal statute to "conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266 (internal citations omitted).  Criminal liability cannot turn on the vagaries of a rule-of-reason analysis or on the violation of a *per se* rule that has not previously been established.

The Sherman Act is "'couched in language broad and general,'" and, "unlike most traditional criminal statutes, does not, in clear and categorical terms, precisely identify the conduct which it proscribes." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438-39 (1978) (quoting Dep't of Justice, Report of the Attorney General's Nat'l Comm. to Study the Antitrust Laws (1955)); *see also* AREEDA & HOVENKAMP, ANTITRUST LAW §303b3 (4th ed. 2020) ("The prohibitions of the Sherman Act are . . . quite vague and general.").  Instead, "the behavior

proscribed by the Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct." *U.S. Gypsum Co.*, 438 U.S. at 440-41.

Thus, when interpreting laws such as the Sherman Act, courts must adhere to a "canon of strict construction" that entails "resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Lanier*, 520 U.S. at 266. "[A]lthough clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.* (internal citations omitted).

It is axiomatic that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cleveland v. United States*, 531 U.S. 12, 25 (2000). Following that maxim, the Supreme Court has previously refused to expand a facially broad criminal statute to punish conduct not previously covered by the statute. In *Skilling v. United States*, the Supreme Court limited the application of the "honest services" wire fraud statute, 18 U.S.C. § 1346, to the "core misconduct" of bribery and kickbacks. 561 U.S. 358, 408-09 (2010) (quoting *United States v. Urciuoli*, 513 F.3d 290, 294 (1st Cir. 2008)). In prohibiting schemes "to deprive another of the intangible right of honest services," the language of the honest services statute reaches well beyond bribery and kickbacks. 18 U.S.C. § 1346. Nonetheless, the Court refused to expand it to cover the conduct alleged in the indictment. *Skilling*, 561 U.S. at 413. The Court emphasized that "[t]he 'vast majority' of the honest-services cases involved offenders who . . . participated in bribery and kickback schemes." *Id.* at 407. The Court concluded further that extending the statute's reach beyond bribery and kickbacks could render the statute impermissibly vague, raising due process concerns. *Id.* at 408.

The analysis of the *Skilling* Court is equally applicable in this case. As noted above, the Sherman Act is a facially broad statute, limited in scope only by careful judicial scrutiny. That scrutiny has resulted in the Sherman Act prohibiting only unreasonable restraints in trade, with only the most "predictable and pernicious" categories of restraints deemed presumptively unreasonable and earning the label *per se* violations. For the Sherman Act, those *per se* categories have been limited to price fixing, bid rigging, market allocation, and certain types of group boycott agreements. As the Supreme Court refused to do in *Skilling*, this Court should refuse to expand the criminal reach of the Sherman Act beyond those previously identified categories. The rule of lenity mandates such a result.

Expanding the categories of *per se* conduct in a criminal case would deny Jindal his Constitutional guarantees of due process and fair notice. Everyone "should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Thus, the standard is whether the statute itself or as construed "made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267. As detailed above, no court has found that purported wage-fixing agreements constitute criminal conduct under the Sherman Act. Nor has the Supreme Court or any Court of Appeals found wage fixing to be *per se* unlawful, such that a person would even contemplate that a criminal prosecution was a possibility. Thus, with a facially broad statute and the absence of jurisprudence as a guide, Jindal could not possibly have had fair warning that the conduct alleged in the Indictment may be criminal.

The government may contend that it gave sufficient notice that wage fixing is a *per se* and criminal violation of the Sherman Act when the DOJ and FTC issued guidance in 2016. *See* U.S. DEP'T OF JUST. & FED. TRADE COMM'N, ANTITRUST GUIDANCE FOR HUMAN RESOURCE

16

PROFESSIONALS 4 (October 2016) (the "2016 Guidance").  However, neither the DOJ nor the FTC possesses the authority to declare unilaterally that conduct is criminal or *per se* illegal under the Sherman Act.  Congress can pass laws to declare conduct illegal, and the courts can interpret those laws and decide whether conduct falls within their scope, as the courts have done in identifying the contours of *per se* Sherman Act violations.  The DOJ does not, however, decide what is criminal, and the 2016 Guidance does not have the force of law, let alone criminal law.  *See Aya Healthcare Servs. Inc. v. AMN Healthcare, Inc.*, Case No.: 17cv205-MMA (MDD), 2020 WL 2553181, at *13 (S.D. Cal. May 20, 2020) ("DOJ's policy is not binding authority"); *Krzalic v. Republic Title Co*., 314 F.3d 875, 883 (7th Cir. 2002) (Easterbrook, J., concurring) ("[j]udges do not apply *Chevron* to the Attorney General's interpretation of the Sherman Antitrust Act"); *cf. Azar v. Allina Health Servs.*, 139 S.Ct. 1804 (2019) (holding agency guidance establishing or changing a "substantive legal standard" under the Medicare Act must undergo notice-and-comment process before adoption and enforcement).

That the DOJ issued the 2016 Guidance to announce specifically that it considered wage-fixing agreements to be *per se* violations of the Sherman Act, and its intent to prosecute such agreements, is telling.  There would be no need for the DOJ to announce that such conduct was *per se* unlawful if courts had repeatedly and routinely concluded that such agreements have "'manifestly anticompetitive' effects" and "lack . . . any redeeming virtue."  *Leegin*, 551 U.S. at 886 (internal citations omitted).  Indeed, the 2016 Guidance fails to reference a single case holding that purported wage-fixing agreements are *per se* illegal.

Because neither the Supreme Court nor any Court of Appeals has ever addressed whether so-called "wage fixing" is *per se* unlawful, such a construction of the statute would be novel and would not give fair warning that the conduct could be considered criminal.  *See Lanier*, 520 U.S.

at 267.  Jindal's due process rights would be violated by the application of the statute as set forth in the Indictment, for lack of fair warning of DOJ's unwarranted arrogation of authority and unprecedented action.  As such, the Court should dismiss Count One.

**B.    The Indictment's *Per Se* Designation Improperly Promotes Presumption of Intent.**

The Sixth Amendment to the United States Constitution gives a criminal defendant the Constitutional right to have a jury decide whether the prosecution has proven its case, and provides in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ."  State of mind is an element of a criminal offense, "which must be established by evidence and inferences drawn therefrom. . . ."  *U.S. Gypsum Co.*, 438 U.S. at 435. The determination of the element of intent "cannot be taken from the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on" wages.  *See id.* (in the context of prices).  The Supreme Court has held that such a conclusive presumption violates due process and the right to a jury trial in a criminal case.  *See Francis v. Franklin*, 471 U.S. 307, 317 (1985) ("An irrebuttable or conclusive presumption relieves the State of its burden of persuasion by removing the presumed element from the case entirely if the State proves the predicate facts."); *see also, e.g.*, *Carella v. California*, 491 U.S. 263, 265-66 (1989) (presumptive directions "foreclose[] independent jury consideration of whether the facts prove[] established certain elements of the offenses"); *Sandstrom v. Montana*, 442 U.S. 510, 517 (1979); *Morissette v. United States*, 342 U.S. 246, 274-75 (1952).

Even if this Court were to find that wage fixing was a *per se* violation, such a designation would improperly suggest that intent could be presumed without further evidence.  Such a presumption of intent unconstitutionally takes from the jury the determination of intent, thus depriving Jindal of his right to trial by jury.

## VI.    CONCLUSION

In Count One the government purports to allege conduct that does not constitute a *per se* violation of the Sherman Act, nor does it allege the elements of a rule-of-reason offense.  As such, Count One fails to state an offense and must be dismissed.  Moreover, the absence of sufficient precedent supporting the government's *per se* theory confirms that Jindal was not put on fair notice that his alleged conduct was criminal.  Accepting the government's invitation to expand the universe of *per se* conduct to include a type of purported agreement never before held to be *per se* illegal would deprive Jindal of his Constitutionally guaranteed due process rights.

19

Dated:  May 25, 2021.

Respectfully submitted,

**LOCKE LORD LLP**

By:  */s/ Paul E. Coggins*
  Paul E. Coggins (attorney-in-charge)
   pcoggins@lockelord.com
   Texas Bar No. 04504700
  Bradley C. Weber
   bweber@lockelord.com
   Texas Bar No. 21042470
  Brendan P. Gaffney
   bgaffney@lockelord.com
   Texas Bar No. 24074239
  2200 Ross Avenue, Suite 2800
  Dallas, TX  75201
  Telephone (214) 740-8000
  Facsimile (214) 740-8800

**Counsel for Defendant Neeraj Jindal**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served upon all counsel of record via the Court's electronic filing service on this 25th day of May, 2021.

*/s/ Paul E. Coggins*
Counsel for Defendant