IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 4:20-CR-358-1 |
| | § | JUDGE MAZZANT |
| NEERAJ JINDAL (1) | § | |
| | § | |

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT NEERAJ JINDAL'S MOTION TO DISMISS
COUNT ONE OF THE FIRST SUPERSEDING INDICTMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   THE GRAND JURY'S ALLEGATIONS ........................................................... 1

III.  LEGAL STANDARD ......................................................................................... 3

IV.   ARGUMENT ...................................................................................................... 4

    A.   Count One of the Indictment Validly and Sufficiently Charges a Conspiracy to Fix Prices ................................................................................ 4

    B.   The Price-Fixing Conspiracy Charged in Count One Is *Per Se* Unlawful Under the Sherman Act .................................................................. 7

    C.   Wage Fixing Is Price Fixing .................................................................... 8

    D.   Count One of the Indictment Satisfies Due Process. ............................. 11

V.    CONCLUSION ................................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**

*Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946) ........................................... 5

*Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359 (1926) ...................... 9, 12

*Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332 (1982) ..................................... 7

*Barber v. Thomas*, 560 U.S. 474 (2010) ................................................................... 12

*Doe v. Arizona Hosp. & Healthcare Ass'n*, No. CV07-1292, 2009 WL 1423378
   (D. Ariz. Mar. 19, 2009) ........................................................................................ 8, 11

*F.T.C. v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411 (1990) ....................... 7, 10, 12

*Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130 (N.D.N.Y. 2010) ................... 11

*Francis v. Franklin*, 471 U.S. 307 (1985) ................................................................. 13

*Gerstein v. Pugh*, 420 U.S. 103 (1975) ....................................................................... 6

*Hiett v. United States*, 415 F.2d 664 (5th Cir. 1969) ................................................ 11

*In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175 (N.D. Cal. 2015) ..... 11

*Kaley v. United States*, 571 U.S. 320 (2014) .......................................................... 6, 13

*Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219 (1948) ............... 8, 9

*Nash v. United States*, 229 U.S. 373 (1913) ............................................................. 11

*Roman v. Cessna Aircraft Co.*, 55 F.3d 542 (10th Cir. 1995) ...................................... 8

*Skilling v. United States*, 561 U.S. 358 (2010) ......................................................... 12

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) .................................................................... 7

*United States v. Bittner*, 469 F. Supp. 3d 709 (E.D. Tex. 2020).................................... 12

*United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101 (7th Cir. 1979) ............................ 7

*United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078 (5th Cir. 1978)............................ 6

*United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676 (5th Cir. 1981)......................... 5, 7, 13

*United States v. Churchill*, No. 4:20-CR-00252(1), 2021 WL 862284
    (E.D. Tex. Mar. 8, 2021)........................................................................... 4, 5, 6

*United States v. Cinemette Corp. of Am.*, 687 F. Supp. 976 (W.D. Pa. 1988)................. 12, 13, 14

*United States v. Colgate & Co.*, 250 U.S. 300 (1919) ................................................ 9

*United States v. Giordano*, 261 F.3d 1134 (11th Cir. 2001)...................................... 7, 13

*United States v. Harwin*, No. 2:20-CR-00115, 2021 WL 719614
    (M.D. Fla. Feb. 24, 2021) ................................................................... 7, 11, 12

*United States v. Hogue*, 132 F.3d 1087 (5th Cir. 1998)) ............................................ 4

*United States v. Kay*, 359 F.3d 738 (5th Cir. 2004)................................................... 4

*United States v. Lanier*, 520 U.S. 259 (1997)........................................................ 12

*United States v. Shabani*, 513 U.S. 10 (1994) ........................................................ 5

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)............................... 7, 8, 12

*United States v. Strouse*, 286 F.3d 767 (5th Cir. 2002) ............................................. 6

*United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897)......................... 12

*United States v. Trenton Potteries Co.*, 273 U.S. 392 (1927)...................................... 12

**Statutes**

15 U.S.C. § 1 ............................................................................... 1, 4, 7, 12

**Other Authorities**

II *Phillip Areeda & Herbert Hovenkamp, Antitrust Law* (rev. ed. 1995) ...................................... 8

**Rules**

Federal Rule of Criminal Procedure 7 ................................................................ 3

Federal Rule of Criminal Procedure 12 ............................................................ 1, 3

Federal Rule of Evidence 201 ...................................................................... 5, 14

## I.    INTRODUCTION

The Grand Jury returned a First Superseding Indictment (the "Indictment") on April 14, 2021, against Neeraj Jindal and John Rodgers (collectively, "the Defendants") (Dkt. #21).  Jindal moves under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) to dismiss Count One for failure to state an offense (Dkt. #36, at 1).[1]  In Count One, the Grand Jury found probable cause that Jindal knowingly engaged in a conspiracy to fix prices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Dkt. #21 ¶¶ 1–13).  Count One sufficiently states that offense because it provides Jindal with notice of the charge and enables him to prepare a defense.  The conspiracy alleged in Count One is a criminal violation of the Sherman Act because price fixing is *per se* unlawful.  A conspiracy to fix rates paid to workers is simply price fixing in a labor market, as the Supreme Court has recognized.  Jindal's due process arguments against Count One are similarly contrary to long-established precedent.  Accordingly, the Court should deny Jindal's motion.

## II.    THE GRAND JURY'S ALLEGATIONS

During the time period charged in Count One of the Indictment, Jindal was the owner of a therapist staffing company, Company A (Dkt. #21 ¶ 5).  Rodgers was a clinical director of Company A (Dkt. #21 ¶ 6).  Therapist staffing companies such as Company A contract with or employ physical therapists ("PTs") and physical therapist assistants ("PTAs") who travel to patients' homes or assisted living facilities to provide care (Dkt. #21 ¶¶ 1–2).  Therapist staffing companies receive patient referrals from home health agencies and act as "middlemen," staffing their PTs or PTAs to provide patient care (Dkt. #21 ¶¶ 1–2).  Therapist staffing companies compete with each other to contract with or employ PTs and PTAs (Dkt. #21 ¶ 4).  PTs and PTAs may

---

[1] Jindal has not moved to dismiss Counts Two and Three, in which the Grand Jury charged him with conspiracy to commit obstruction and false-statement offenses and obstruction of a Federal Trade Commission proceeding (Dkt. #21 ¶¶ 14–23; Dkt. #36).

United States' Response in Opposition to Defendant Jindal's Motion to Dismiss
Page 1

contract with or be employed by multiple therapist staffing companies and choose among them based on pay rate, volume of patient referrals, and location of patients (Dkt. #21 ¶ 4).

Company A contracted with PTs and PTAs to provide in-home physical therapy services to patients located in the Dallas-Fort Worth metropolitan area (Dkt. #2 ¶ 7).  Each PT and PTA who contracted with Company A had a set price (a "rate" or "pay rate") that Company A paid them for providing an in-home physical therapy visit (Dkt. #21 ¶ 7).  Company A billed home health agencies set prices (the "bill rate") for providing therapy services (Dkt. #21 ¶ 7).  The difference between the pay rates that Company A paid to its PTs and PTAs and the bill rates that it billed to home health agencies constituted Company A's margin (Dkt. #21 ¶ 7).  Individual 2 owned Company B, another therapist staffing company that provided PT and PTA staffing services in the Dallas-Fort Worth metropolitan area (Dkt. #21 ¶ 8).  Company B competed with Company A to contract with PTs and PTAs (Dkt. #21 ¶ 8).

From in or around March 2017 to in or around August 2017, Jindal, Rodgers, and their co-conspirators knowingly entered into and engaged in a conspiracy to suppress competition by agreeing to fix prices by lowering the pay rates to PTs and PTAs (Dkt. #21 ¶ 11).  On March 10, 2017, beginning at approximately 1:36 p.m. CST, Rodgers, acting on behalf of Jindal and Company A, texted with Individual 2, the owner of competitor Company B, regarding the rates that Company A and Company B paid their PTs and PTAs (Dkt. #21 ¶ 12(a)).  Rodgers texted Individual 2, stating "[h]ave you considered lowering PTA reimbursement" and "I think we're going to lower PTA rates to $45" (Dkt. #21 ¶ 12(a)).  Individual 2 responded, texting "[y]es I agree" and "I'll do it with u" (Dkt. #21 ¶ 12(a)).  Rodgers responded with a "thumbs up" emoji and texted, "I feel like if we're all on the same page, there won't be a bunch of flip-flopping and

industry may stay stable" (Dkt. #21 ¶ 12(a)).  Rodgers reported back to Jindal regarding this text message conversation with Individual 2 (Dkt. #21 ¶ 12(a)).

Jindal subsequently texted the owners of additional therapist staffing companies, inviting more competitors to join the conspiracy to collectively lower rates (Dkt. #21 ¶ 12(b)). Specifically, on March 10, 2017, beginning at approximately 3:54 p.m. CST, Jindal separately texted at least four other owners of therapist staffing companies (Dkt. #21 ¶ 12(b)).  Jindal wrote to each owner, "I am reaching out to my counterparts about lowering PTA pay rates to $45" and asked, "[w]hat are your thoughts if we all collectively do it together?" (Dkt. #21 ¶ 12(b)).  Jindal wrote to each owner that he had Company B "on board" and stated, "I think we all collectively should move together" (Dkt. #21 ¶ 12(b)).

On March 17, 2017, at approximately 3:44 p.m. CDT, Rodgers, acting in furtherance of the conspiracy, texted Individual 2 (Dkt. #21 ¶ 12(c)).  Rodgers stated:  "FYI we made rate changes effective next payroll Monday decreasing PT's and PTA's" (Dkt. #21 ¶ 12(c)).  In response, Individual 2 texted:  "Well I can join in where did u go" (Dkt. #21 ¶ 12(c)).  Rodgers and Individual 2 subsequently exchanged text messages regarding Company A's and Company B's pay rates for PTs and PTAs (Dkt. #21 ¶ 12(c)).  Pursuant to the agreement, Company A thereafter paid lower rates to certain PTs and PTAs (Dkt. #21 ¶ 12(d)).

## III.    LEGAL STANDARD

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government."  Fed. R. Crim. P. 7(c)(1).  Pretrial motions may raise "any defense, objection, or request that the court can determine without a trial on the merits," including a motion to dismiss an indictment for "failure to state an offense."  Fed. R. Crim. P. 12(b)(1), (3)(B)(v).  A motion to dismiss "for failure

to state an offense is a challenge to the sufficiency of the indictment." *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004).

"An indictment is legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal to bar a subsequent prosecution." *United States v. Churchill*, No. 4:20-CR-00252(1), 2021 WL 862284, at *1 (E.D. Tex. Mar. 8, 2021). "[A]n indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on the merits." *Id.* at *2 (quoting *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975)). In evaluating the Indictment's sufficiency, the Court is "required to 'take the allegations of the indictment as true and to determine whether an offense has been stated.'" *Kay*, 359 F.3d at 742 (quoting *United States v. Hogue*, 132 F.3d 1087, 1089 (5th Cir. 1998)). "[W]hen an indictment is facially valid, courts may not inquire into the sufficiency or competency of the evidence." *Churchill*, 2021 WL 862284, at *2.

## IV.    ARGUMENT

### A.    Count One of the Indictment Validly and Sufficiently Charges a Conspiracy to Fix Prices.

Count One of the Indictment "should not be dismissed for failure to state an offense because it contains all essential elements of the crime and enables [Jindal] to prepare a defense for trial." *Churchill*, 2021 WL 862284, at *2.

The Grand Jury properly charged Jindal with each element of a price-fixing conspiracy in violation of 15 U.S.C. § 1 (Dkt. #21 ¶ 11). In a price-fixing case, the United States must prove three elements: First, that conspirators "knowingly formed, joined or participated in a combination or conspiracy to fix, raise, maintain or stabilize" prices; second, that the defendant "knowingly formed, joined or participated in [that] combination or conspiracy"; and third, that the activities

subject to the conspiracy either "occurred in the flow of interstate commerce" or "substantially affected interstate commerce." *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 679, 681 (5th Cir. 1981).  Count One tracks these elements.  It alleges that a conspiracy "to fix prices by lowering the pay rates to PTs and PTAs" existed "[f]rom in or around March 2017 to in or around August 2017," and that the conspirators "knowingly entered into and engaged in [that] conspiracy" (Dkt. #21 ¶ 11).  It alleges that Jindal was one of the conspirators who "knowingly entered into and engaged in [that] conspiracy" (Dkt. #21 ¶ 11).  And it alleges that "the business activities of [the Defendants] and their co-conspirators that are the subject of the conspiracy . . . were within the flow of, and substantially affected, interstate trade and commerce" (Dkt. #21 ¶ 13).  The Grand Jury need not allege anything more; it need not allege the existence of a formal agreement or even that the agreement was implemented.  *Cf., e.g.*, *United States v. Shabani*, 513 U.S. 10, 14 (1994); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809–10 (1946).  "Because the Indictment contains all essential elements of the crime, the Indictment properly states an offense."  *Churchill*, 2021 WL 862284, at *2.[2]

Jindal "implicitly asks the Court to evaluate the veracity of evidence underlying the Indictment."[3]  *Id*. at *2.  He asks the Court to rewrite the indictment, challenging the Grand Jury's probable cause finding that he engaged in a *price*-fixing conspiracy (Dkt. #36, at 10, 11 (arguing "[t]he Indictment does not allege any agreement to fix 'prices'" and "the Indictment uses the word 'prices' to refer to the pay rates for PTs and PTAs, whereas it should have used the appropriate word: wages")).  But "in testing the sufficiency of an indictment, a court must not pierce the

---

[2] Count One also provides "sufficient [detail] to protect [Jindal] from double jeopardy," *Churchill*, 2021 WL 862284, at *3, and Jindal does not argue otherwise (Dkt #36).

[3] Jindal reveals the nature of his request by asking the Court to take judicial notice of a document outside the Indictment under Federal Rule of Evidence 201 (Dkt. #36, at 12 n.3), which applies to "an adjudicative *fact* only," Fed. R. Evid. 201(a) (emphasis added).

pleadings and make a premature resolution of the merits of the allegations." *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1082 (5th Cir. 1978). Here, the Grand Jury found probable cause that Jindal committed the crime of price fixing: he agreed to fix the *prices* his company paid PTs and PTAs for their services (Dkt. #21 ¶ 7 (finding PTs and PTAs "had set *prices* (a 'rate' or 'pay rate') that Company A paid them" (emphasis added)), ¶ 11 (finding Jindal conspired "to suppress competition by *agreeing to fix prices* by lowering the pay rates to PTs and PTAs" (emphasis added))). This probable cause finding is "inviolable." *Kaley v. United States*, 571 U.S. 320, 329 (2014).

Jindal asks the Court to circumvent the Grand Jury's probable cause finding that a price-fixing conspiracy existed (Dkt # 36). He does *not* argue that the Indictment fails to state the offense of price fixing—the offense it alleges—but rather that the Court should dismiss the Indictment for failing to state an offense it "should have" alleged (Dkt. #36, at 11). Doing so would "run[] 'counter to the whole history of the grand jury institution.'" *Churchill*, 2021 WL 862284, at *2 (quoting *United States v. Strouse*, 286 F.3d 767, 773 (5th Cir. 2002)). It is "[t]he grand jury [that] gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Kaley*, 571 U.S. at 328. "'[A]n indictment "fair upon its face," and returned by "a properly constituted grand jury" . . . conclusively determines the existence of probable cause' to believe the defendant perpetrated the offense alleged." *Id.* (alteration in original) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975)).

"As the Indictment puts [Jindal] on notice of his charges and enables him to prepare a defense for trial, the Indictment should not be dismissed for failure to state an offense." *Churchill*, 2021 WL 862284, at *3.

## B.   The Price-Fixing Conspiracy Charged in Count One Is *Per Se* Unlawful Under the Sherman Act.

Section 1 of the Sherman Act outlaws contracts, combinations, and conspiracies that unreasonably restrain trade and declares that persons who engage in such illegal conduct shall be deemed guilty of a felony, punishable by up to ten years' imprisonment and a fine.  15 U.S.C. § 1; *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).  "Certain types of restraints, such as price fixing or some types of market division, are in and of themselves unreasonable restraints on trade; these restraints are referred to as *per se* violations of the antitrust statutes."  *Cargo Serv.*, 657 F.2d at 682 n.4.; *see also, e.g.*, *F.T.C. v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 434 (1990); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940).  "[A] finding that [a defendant] intended to fix prices supplies the criminal intent necessary for a conviction of a criminal antitrust offense."  *Cargo Serv.*, 657 F.2d at 684.  "It is as if the Sherman Act read:  'An agreement among competitors to [fix prices] is illegal.'"  *United States v. Giordano*, 261 F.3d 1134, 1144 (11th Cir. 2001) (alteration in original) (quoting *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979)).

The *per se* rule applies categorically to price fixing in all industries and markets.  *See Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982) ("[T]he argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules . . . ."); *United States v. Harwin*, No. 2:20-CR-00115, 2021 WL 719614, at *5 (M.D. Fla. Feb. 24, 2021) ("[T]he medical industry does not receive special exemptions from *per se* rules, even though it may (in some ways) be different from competitive manufacturing markets.").

"[T]he Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike."  *Socony-Vacuum*, 310 U.S. at 222.  "Price-fixing

agreements among buyers, like those among sellers, are prohibited by the Sherman Act, even where the damage caused by the agreement is to sellers and not consumers." *Doe v. Arizona Hosp. & Healthcare Ass'n*, No. CV07-1292, 2009 WL 1423378, at *3 (D. Ariz. Mar. 19, 2009) (citing *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948); *Socony-Vacuum*, 310 U.S. at 223–24).  Here, the Grand Jury alleged a price-fixing agreement among buyers in a labor market, specifically a conspiracy by Jindal to fix the "prices (a rate or pay rate) that Company A paid [PTs and PTAs] for providing in-home care visits" (Dkt. #21 ¶¶ 7, 11).  The conspiracy charged in Count One of the Indictment is thus a *per se* criminal violation of the Sherman Act.

### C.  Wage Fixing Is Price Fixing

Conspiring to fix the price for which labor is purchased or sold is price fixing.  *See Nat'l Collegiate Athletic Ass'n v. Alston*, Nos. 20-512 and 20-520, 2021 WL 2519036, at *21 (U.S. June 21, 2021) (Kavanaugh, J., concurring) ("Price-fixing labor is price-fixing labor.").[4]  "Just as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services." *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 544 (10th Cir. 1995) (quoting II Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 377c (rev. ed. 1995)).  "The [Sherman Act] does not confine its protection to consumers, or

---

[4]      As Justice Kavanaugh also observed in *Alston*, "[t]he NCAA's business model would be *flatly illegal* in almost any other industry in America. . . . . Hospitals cannot agree to cap nurses' income in order to create a 'purer' form of helping the sick."  2021 WL 2519036, at *21 (Kavanaugh, J., concurring) (emphasis added).  Outside the extraordinary context at issue in *Alston*, "in which some 'horizontal restraints on competition are essential if the [NCAA's] product is to be available at all,'" *id.* at *11 (majority opinion) (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984)), "price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work," *id.* at *21 (Kavanaugh, J., concurring).  In *Alston*, the Supreme Court affirmed a judgment that "[t]he NCAA's rules fixing wages for student-athletes" violated the Sherman Act under "ordinary rule of reason review," *id.* at *11, *20 (majority opinion), but *Alston* provides no basis for rule of reason review in an ordinary "textbook" case such as this one, involving the *per se* illegal price fixing of healthcare workers' labor.

to purchasers, or to competitors, or to sellers.  Nor does it immunize the outlawed acts because they are done by any of these.  The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms*, 334 U.S. at 236  (citations omitted).  The antitrust laws fully apply to labor markets.  Workers—no less than commodity buyers—are entitled to the protection of the Sherman Act.

Nearly a century ago, the Supreme Court recognized that the Sherman Act applies to labor markets and, among other things, prohibits employers from fixing the prices paid to workers for their labor.  In *Anderson v. Shipowners' Ass'n of Pacific Coast*, the Supreme Court concluded that an agreement among shipowners controlling seamen's wages violated the Sherman Act.  272 U.S. 359 (1926).  Among other anticompetitive conduct, "[t]he associations *fix[ed] the wages* which shall be paid the seamen."  *Id.* at 362 (emphasis added).  The Supreme Court condemned the conspiracy, explaining that "those who operate [ships]"—i.e., workers—"are instrumentalities of commerce, and within the commerce clause, no less than cargoes"—i.e., commodities.  *Id.* at 363. "The purpose of the Sherman Act is to prohibit . . . combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce," and the Supreme Court concluded that "the effect of the combination [in *Anderson*], both as to the seamen"—i.e., workers—"and the owners,"—i.e., employers—"[was] precisely what this language condemns."  *Id.* (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  The Supreme Court's conclusion in *Anderson* applies equally in this case.  "It is not important, therefore, to inquire whether, as contended by [Jindal], the object of the combination was merely to regulate employment of men [and women], and not to restrain commerce."  *Id.*

More recently, the Supreme Court held in *Superior Court* that a conspiracy by lawyers to raise pay rates for their services was price fixing and, thus, a *per se* violation of the antitrust laws. 493 U.S. at 434.  A group of lawyers who "were in competition with one another . . . provid[ing] services . . . at CJA [Criminal Justice Act] rates," met and "informally agreed that the only viable way of getting an increase in fees was to stop signing up to take new CJA appointments."  *Id.* at 416, 422.  They agreed to engage in a group boycott "aim[ing] for a $45 out-of-court and $55 in-court rate schedule."  *Id.* at 416.  The Supreme Court concluded that the lawyers' conspiracy was *per se* unlawful and "the essence of 'price-fixing.'"  *Id.* at 423.  The Supreme Court "emphasize[d] that [the] case involve[d] . . . a *horizontal price-fixing arrangement*—a type of conspiracy that has been consistently analyzed as a *per se* violation for many decades."  *Id.* at 436 n.19 (emphasis added).  *Superior Court* thus forecloses Jindal's arguments that the definition of price fixing covers only "the price of a commodity" and that "[h]orizontal agreements to fix wages have not been classified as *per se* violations" (Dkt. #36, at 1, 11).  *Superior Court* also forecloses Jindal's argument that "compensation for [PT and PTA] labor . . . . do[es] not fall within the definition of 'price fixing'" (Dkt. #36, at 11).  The Supreme Court recognized that the price-fixing activity at issue in *Superior Court* was "a concerted refusal by CJA lawyers to accept any further assignments until they receive[d] an increase in their *compensation*."  493 U.S. at 426 (emphasis added); *see also id.* at 427 ("[I]t is undisputed that [the lawyers'] immediate objective was to increase *the price that they would be paid for their services*." (emphasis added)).  Contrary to Jindal's arguments, his price-fixing conspiracy as to PT and PTA pay rates, like the *Superior Court* lawyers' conspiracy as to pay rates, "has no special characteristics meriting an exemption from the *per se* rules of antitrust law."  *Id.* at 432.

Multiple courts likewise have held that conspiracies among competing employers to suppress workers' compensation are *per se* antitrust violations. *See In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1179, 1213 (N.D. Cal. 2015) ("[T]he Court concludes that [plaintiff employees] have alleged sufficient facts to support a plausible *per se* claim that [defendant employers] allegedly conspired to suppress the compensation of the putative class."); *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 157–61 (N.D.N.Y. 2010) ("Generally, price-fixing [or in this case wage-fixing] agreements are considered a *per se* violation of the Sherman Act." (alteration in original)); *Arizona Hosp. & Healthcare Ass'n*, 2009 WL 1423378, at *1, *3–4 (rejecting employer defendants' argument that employee plaintiffs' "mere allegation of price fixing does not mean that the *per se* illegal rule applies" where the plaintiffs alleged, among other things, that the employer defendants "jointly set—and wrongfully suppressed—the wages and compensation of temporary nursing staff").

The Sherman Act flatly condemns Jindal's charged conspiracy to fix prices by lowering the amount paid for PT and PTA services, just as it would any conspiracy to fix prices by raising or lowering the amount paid for commodities, goods, or services. Jindal's arguments and assertions to the contrary have no merit.

### D.     Count One of the Indictment Satisfies Due Process.

Equally without merit are Jindal's arguments that Count One violates due process based on the vagueness doctrine, the rule of lenity, and the limits on use of evidentiary presumptions.

"No court has found section one of the Sherman Act unconstitutionally void for vagueness," *Harwin*, 2021 WL 719614, at *7, and Jindal offers no reason for this Court to be the first. Over a century ago, the Supreme Court rejected a vagueness challenge to the Sherman Act. *Nash v. United States*, 229 U.S. 373, 378 (1913); *see Hiett v. United States*, 415 F.2d 664, 670 (5th Cir. 1969) (explaining that *Nash* held the "Sherman Act prohibitions on 'restraint of trade' [were]

sufficiently specific for criminal convictions").  The Supreme Court has long "adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act."  *Socony-Vacuum*, 310 U.S. at 218; *see also United States v. Trenton Potteries Co.*, 273 U.S. 392, 398 (1927); *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 310 (1897).  And the Supreme Court has long recognized that wage fixing is price fixing.  *See Superior Ct.*, 493 U.S. at 423, 427, 432, 436 n.19; *Anderson*, 272 U.S. at 361–63.  This is not even close to a case where "neither the statute nor any prior judicial decision has fairly disclosed [the Defendants' conduct] to be within [the] scope" of the criminal statute.  *United States v. Lanier*, 520 U.S. 259, 266 (1997); *see also, e.g.*, *United States v. Cinemette Corp. of Am.*, 687 F. Supp. 976, 979 (W.D. Pa. 1988) (rejecting "defendants' claims that they were not given fair notice that split agreements could constitute violations of [15 U.S.C.] § 1" when "split agreements" fell within the definition of price fixing).

Jindal's lenity argument fails "[f]or similar reasons."  *Harwin*, 2021 WL 719614, at *8. "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended."  *United States v. Bittner*, 469 F. Supp. 3d 709, 723 (E.D. Tex. 2020) (alteration in original) (quoting *Barber v. Thomas*, 560 U.S. 474, 486–88 (2010)).  In over a century, the Supreme Court has never had to guess whether the Sherman Act prohibits price fixing.  *See, e.g.*, *Socony-Vacuum*, 310 U.S. at 218.  Nor has the Supreme Court ever had to guess whether wage fixing is price fixing.  *See Superior Ct.*, 493 U.S. at 423, 427, 432, 436 n.19; *Anderson*, 272 U.S. 359 at 361–62.  There is no grievous ambiguity or uncertainty in this case. Jindal's lenity argument based on *Skilling v. United States* (Dkt. #36, at 15–16) fails because there is no "disarray over the statute's application" here.  561 U.S. 358, 405 (2010).

Jindal's argument that Count One promotes an improper "conclusive presumption" (Dkt. #36, at 18) ignores the Fifth Circuit's controlling and contrary precedent in *Cargo Service*. "Neither a conclusive nor a permissive presumption is at issue here" because "a finding of intent to fix prices [equates to] an intent to unreasonably restrain trade." *Cargo Serv.*, 657 F.2d at 683 n.7. The Eleventh Circuit considered the issue more recently in *Giordano* and reaffirmed *Cargo Service*'s holding. *Giordano*, 261 F.3d at 1143. Like the defendants in *Giordano*, Jindal relies on *Francis v. Franklin*, 471 U.S. 307 (1985) (Dkt. #36, at 18). This "reliance on *Franklin*[] . . . is misplaced." *Giordano*, 261 F.3d at 1144. "[T]he *per se* rule does not establish a presumption. It is not even a rule of evidence." *Id.* (citation omitted).

Finally, Jindal cannot establish a due process violation by pointing beyond the Indictment to a 2016 guidance document from the Department of Justice and the Federal Trade Commission (Dkt. #36, at 16–17). That guidance has no legal significance because the Department of Justice does not make law when it issues public guidance, educates industry audiences, or announces its enforcement priorities. Moreover, it was the Grand Jury, not the Department, that made a "conclusive" and "inviolable" probable cause finding that Jindal engaged in a price-fixing conspiracy. *Kaley*, 571 U.S. at 329, 331. In any event, the 2016 guidance provides no basis for a due process challenge. In advance of the antitrust prosecution in *Cinemette*, "the Department of Justice issued a press release announcing that henceforth it would take the position that the use of split agreements by motion picture exhibitors violated the antitrust laws" and that such agreements were "virtually indistinguishable from bid rigging practices, a traditional *per se* violation of § 1 of the Sherman Act." 687 F. Supp. at 979–80. The *Cinemette* court rejected the defendant's due process claim in a subsequent criminal prosecution under the Sherman Act, explaining that "the law was clear concerning the legal ramifications of price-fixing[] prior to the period of time at

issue in the indictment" and that "it [was] apparent that the government could have initiated criminal prosecutions concerning [the agreements at issue] without providing any advance notice." *Id.* at 982. The same is true here. Count One does not violate due process.

## V.    CONCLUSION

The United States requests that the Court deny Jindal's motion to dismiss Count One, including his request for judicial notice of any "adjudicative fact," Fed. R. Evid. 201(a), outside the Indictment.

Respectfully submitted,

*/s/ Matthew W. Lunder*

MATTHEW W. LUNDER
Bar No. MT 8671
Email:  matthew.lunder@usdoj.gov

JARIEL A. RENDELL
Bar No. DC 1027023
Email:  jariel.rendell@usdoj.gov

DOHA MEKKI
Bar No. NY 5109715
Email:  doha.mekki@usdoj.gov

RACHEL KROLL
Bar No. NY 5751748
Email:  rachel.kroll@usdoj.gov

Attorneys
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 11300
Washington, DC 20530
(202) 476-0275

COUNSEL FOR THE UNITED STATES

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 22, 2021, I electronically served a true and

correct copy of this document on Defendants' counsel of record by means of the Court's

CM-ECF system.

*/s/ Matthew W. Lunder*
Matthew W. Lunder
