# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | Civil Action No.  4:20-CR-00358 |
| | § | Judge Mazzant |
| NEERAJ JINDAL (1) | § | |
| JOHN RODGERS (2) | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant Neeraj Jindal's Motion to Dismiss Count One of the First Superseding Indictment (Dkt. #36), and Defendant John Rodgers' Motion to Dismiss the Superseding Indictment (Dkt. #45).  Having considered the motions and the relevant pleadings, the Court finds the motions should be **DENIED**.

## FACTUAL BACKGROUND

One December 12, 2020, the Government filed an indictment against Neeraj Jindal ("Jindal") (Dkt. #1), and on April 15, 2021, the Government filed the First Superseding Indictment (hereinafter "Indictment") as to Neeraj Jindal and John Rodgers ("Rodgers") (Dkt. #21).  Pursuant to the Indictment, Defendants were charged with violating the following statutes: 1) 15 U.S.C. § 1 (Antitrust Conspiracy: Price Fixing under the Sherman Act); 2) 18 U.S.C. § 371 (Conspiracy to Commit Offense); and 3) 18 U.S.C. §§ 1505 and 2 (Obstruction of Proceedings before the Federal Trade Commission).

The complexity of this case warrants a recitation of the events leading up to the Indictment. Jindal owned a therapist staffing company, which the Indictment refers to as "Company A" (Dkt. #21 ¶ 5).  Rodgers was a physical therapist who contracted with Company A and was a clinical director of Company A (Dkt. #21 ¶ 6).  Rodgers reported to Jindal in his work (Dkt. #21 ¶ 6).

Company A contracted with physical therapists ("PTs") and physical therapist assistants ("PTAs") to provide in-home physical therapy to patients (Dkt. #21 ¶ 7).  Therapist staffing companies such as Company A receive patient referrals from home health agencies and act as "middlemen," staffing their PTs or PTAs to provide in-home patient care (Dkt. #21 at ¶¶ 1–2). Therapist staffing companies compete with each other to contract with or employ PTs and PTAs (Dkt. #21 ¶ 4).  Each PT and PTA who contracted with Company A had set prices (a "rate" or "pay rate") that Company A paid them for providing in-home care visits (Dkt. #21 ¶ 7).  Company A billed home health agencies set prices (the "bill rate") for providing the services (Dkt. #21 ¶ 7). The difference between the pay rates that Company A paid to its PTs and PTAs and the bill rates that it billed to the home health agencies constituted Company A's margin (Dkt. #21 ¶ 7).

Count One of the Indictment charges Defendants with violating 15 U.S.C. § 1 of the Sherman Act.  More specifically, Count One states:

> From in or around March 2017 to in or around August 2017 (the Relevant Period"), in the Eastern District of Texas and elsewhere, Jindal, Rodgers, and co-conspirators knowingly entered into and engaged in a conspiracy to suppress competition by agreeing to fix prices by lowering the pay rates to PTs and PTAs. The conspiracy engaged in by Jindal, Rodgers, and co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

(Dkt. #21 ¶ 11).

The Indictment alleges that on March 10, 2017, Rodgers, acting on behalf of Jindal and Company A, texted with the owner of a competing staffing company, Individual 2, regarding the rates that Company A and Individual 2's staffing company paid their PTs and PTAs (Dkt. #21 ¶ 12(a)).  During the text exchange, Rodgers texted Individual 2, asking, "[h]ave you considered lowering PTA reimbursement" and stating, "I think we're going to lower PTA rates to $45" (Dkt. #21 ¶ 12(a)).  Individual 2 responded, "[y]es I agree" and "I'll do it with you" (Dkt. #21 ¶ 12(a)).

2

Rodgers responded with a "thumbs up" emoji and texted, "I feel like if we're all on the same page, there won't be a bunch of flip flopping and industry may stay stable" (Dkt. #21 ¶ 12(a)).  According to the Indictment, Rodgers reported back to Jindal regarding this text message conversation with Individual 2 (Dkt. #21 ¶ 12(a)).

The Indictment further alleges that, following the text exchange between Rodgers and Individual 2, Jindal texted the owners of other therapist staffing companies to recruit additional competitors to join the conspiracy to collectively lower rates (Dkt. #21 ¶ 12(b)).  Specifically, on March 10, 2017, Jindal separately texted at least four other owners of therapist staffing companies, saying "I am reaching out to my counterparts about lowering PTA rates to $45.  What are your thoughts if we all collectively do it together?" (Dkt. #21 ¶ 12(b)).  Jindal further texted each owner that he had Individual 2's company "on board" (Dkt. #21 ¶ 12(b)).

The Indictment then references another text exchange between Rodgers and Individual 2 that took place on March 17, 2017 (Dkt. #21 ¶ 12(c)).  Rodgers stated: "FYI we made rate changes effective next payroll Monday decreasing PT's and PTA's" (Dkt. #21 ¶ 12(c)).  Individual 2 responded: "Well I can join in where did u go" (Dkt. #21 ¶ 12(c)).  According to the Indictment, Rodgers and Individual 2 subsequently exchanged text messages regarding their companies' pay rates for PTs and PTAs (Dkt. #21 ¶ 12(c)).  And, pursuant to the agreement, Company A thereafter paid lower rates to certain PTs and PTAs (Dkt. #21 ¶ 12(d)).

On May 25, 2021, Jindal filed his Motion to Dismiss Count One of the First Superseding Indictment (Dkt. #36).  On June 18, 2021, Rodgers filed his Motion to Dismiss the Superseding Indictment (Dkt. #45).  In Rodgers' motion, he incorporated the arguments in Jindal's motion and added a separate argument alleging the Government's prosecution of him breached an oral agreement (Dkt. #45).  The United States Responded to Jindal's Motion on June 22, 2021 (Dkt.

#46) and responded to Rodgers' Motion on July 16, 2021 (Dkt. #48).  Jindal filed a Reply on July

6, 2021 (Dkt. #47).  Rodgers filed a Reply on July 30, 2021 (Dkt. #50).

## STATUTORY BACKGROUND

Since Count One of the Indictment charges Defendants with violating § 1 the Sherman Act,

the Court finds it helpful to provide an overview of the Sherman Act before turning to Defendants'

arguments.  The Sherman Act prohibits "[e]very contract, combination in the form of trust or

otherwise, or conspiracy, in restraint of trade or commerce among the several

States." 15 U.S.C. § 1.  The Supreme Court, however, "has not taken a literal approach" in

interpreting this language. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  Instead, the Supreme

Court has found § 1 "outlaw[s] only *unreasonable* restraints." *State Oil Co. v. Khan*, 522 U.S. 3,

10 (1997) (emphasis added).  In determining whether a restraint is unreasonable, and thus

unlawful, courts use one of two rules of decision. *MM Steel, L.P. v. JSW Steel (USA) Inc*., 806

F.3d 835, 848 (5th Cir. 2015).

Most restraints under § 1 are analyzed under the so-called rule of reason. *Arizona v.

Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 343 (1982).  As its name suggests, the rule of reason

requires a context-specific inquiry to "distinguish[] between restraints with anticompetitive effect

that are harmful to the consumer and restraints stimulating competition that are in the consumer's

best interest." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc*., 551 U.S. 877, 886 (2007).  Rule

of reason analysis involves "analyzing the facts peculiar to the business, the history of the restraint,

and the reasons why it was imposed." *Nat'l Soc'y of Prof. Eng'r v. United States*, 435 U.S. 679,

692 (1978).

A smaller group of restraints under § 1 are at the outset "deemed unlawful *per se*"

dispensing with the need for case-by-case evaluation. *Kahn*, 522 U.S. at 10.  These restraints are

unreasonable *per se* because the conduct at issue is "manifestly anticompetitive" and "always or almost always tend[s] to restrict competition and decrease output." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (internal citations omitted).  *Per se* treatment is reserved for "only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Dagher*, 547 U.S. at 5 (internal citations omitted). Thus, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue" in order to determine whether it has the requisite "manifestly anticompetitive effect[]." *Leegin*, 551 U.S. at 886 (quotation omitted).

"Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'—qualify as unreasonable *per se*." *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2283–84 (2018) (quoting *Bus. Elecs.*, 485 U.S. at 730).  Courts have found three types of horizontal restraints to be *per se* violations of the Sherman Act: price fixing, market allocation, and bid rigging.[1] *See, e.*g., *Dagher*, 547 U.S. at 5 (price fixing); *Palmer v. BRG of Ga, Inc.,* 498 U.S. 46, 49–50 (1990) (market allocation); *United States v. Young Brothers Inc.*, 728 F.2d 682, 687 (5th Cir. 1984) (bid rigging).  If a naked trade restraint falls in one of these forms, it is summarily condemned *per se* illegal.

The Sherman Act is enforced both criminally and civilly. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978) ("Both civil remedies and criminal sanctions are authorized with regard to the same generalized definitions of the conduct proscribed.").  But the Department of Justice has a longstanding policy of only bringing criminal antitrust prosecutions based on *per se* violations of the Act. *See United States v. Kemp & Assocs, Inc*. 907 F.3d 1264, 1274 (10th Cir.

---

[1] Certain types of group boycotts have also been found to be *per se* illegal, but "precedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.* 525 U.S. 128, 135 (1998).

2018) (noting that the United States Attorney's Antitrust Manual states that "current Antitrust Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements.").  Whether the allegations in an Indictment constitute a *per se* violation is a legal question for the court. *MM Steel*, 806 F.3d at 847 ("The decision to analyze the conspiracy under a per se theory of liability is a question of law . . . ."); *see also Maricopa Cnty*, 457 U.S. at 337 n.3, 354.

## LEGAL STANDARD

An indictment is subject to dismissal for the Government's failure to state an offense. *See* FED. R. CRIM. P. 12(b)(3)(B).  This means that, taking the Government's allegations as true, *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011), the indictment must state the elements of each offense and facts "sufficient to permit the defendant to plead former jeopardy in a subsequent prosecution." *United States v. Contris*, 592 F.2d 893, 896 (5th Cir. 1979).  Indictments are read as a whole, and "[t]he sufficiency of an indictment is to be tested by practical rather than technical considerations." *Id.*  Indeed, "the law does not compel a ritual of words." *United States v. Ratcliff*, 488 F.3d 639, 643 (5th Cir. 2007) (citation omitted).  As such, an indictment will not be dismissed based on minor deficiencies or because it "could have been more artfully or precisely drawn." *Contris*, 592 F.2d at 896.  Courts generally measure the sufficiency of an indictment "by whether (1) each count contains the essential elements of the offense charged, (2) the elements are described with particularity, without any uncertainty or ambiguity, and (3) the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense." *United States v. Threadgill*, 172 F.3d 357, 366 (5th Cir. 1999) (citation omitted).

**ANALYSIS: JINDAL'S MOTION**

In the present motion, Jindal argues that Count One of the Indictment should be dismissed for two main reasons (Dkt. #36). First, he argues that that Count One fails to state an offense under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) because it does not identify a *per se* Sherman Act violation (Dkt. #36 at p. 1). Second, Jindal argues that Count One violates due process under the Fifth and Sixth Amendments because he did not receive "fair warning" the conduct was criminal, and the *per se* designation improperly promotes a presumption of intent (Dkt. #36 at pp. 13–14). Rodgers adopts Jindal's arguments for Count One and also moves to dismiss the Indictment on the basis that the Government has breached an alleged oral agreement not to prosecute him. Because both Defendants move to dismiss Count One on the same grounds, the Court will address the arguments pertaining to Count One in Jindal's motion first before addressing Rodgers' separate argument.

I.    **Sufficiency of the Indictment—Do the Allegations in the Indictment Constitute a *Per Se* Violation of the Sherman Act?**

In Count One of the Indictment, Defendants were charged with conspiracy to fix prices in violation of § 1 of the Sherman Act. The Indictment further alleges that the alleged conspiracy was a *per se* violation of the Sherman Act (Dkt. #21 ¶ 11) ("The conspiracy engaged in by Jindal, Rodgers, and co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act."). Accordingly, in the Government's view, to obtain conviction, it does not need to prove market power, intent, or any anticompetitive effects on trade—it simply must prove the bare fact that an agreement existed. This is further reflected by the Indictment—it does not allege any of the elements of a rule-of-reason offense. Thus, the Indictment can only stand if the allegations in it constitute a *per se* violation of the Sherman Act. Stated differently, the Indictment must be dismissed if it fails to state

a cognizable *per se* offense under the Sherman Act.  Whether the allegations in the Indictment constitute a *per se* violation is a question of law for the Court. *MM Steel*, 806 F.3d at 847.

For over 100 years, the Supreme Court has consistently held that price-fixing agreements are unlawful *per se* under the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940).  In fact, the Supreme Court has stated that "[n]o antitrust offense is more pernicious than price fixing." *Fed. Trade Comm'n v. Ticor Title Ins. Co.*, 504 U.S. 621, 639 (1992). Defendants do not dispute that the Supreme Court has designated price fixing as a *per se* Sherman Act violation (Dkt. #47 at p. 3).  But Defendants do dispute that the Indictment in-fact alleges a price-fixing agreement (Dkt. #47 at p. 4).

The core of Defendants argument is that the Indictment does not allege a price-fixing agreement because it "[a]t most[] alleges an agreement to fix wages" (Dkt. #36 at p. 13). According to Defendants, though the Indictment uses the word "prices" to refer to the "pay rates" for the PTs and PTAs, the "appropriate word" to describe the "pay rates" is "wages" because the rates constitute compensation for the PTs' and PTAs' labor (Dkt. #36 at p. 13).   Thus, Defendants argue that the "Indictment does not allege any agreement to fix 'prices'" because "[w]ages do not fall within the definition of 'price fixing,' which is defined as 'fixing . . . the price of a commodity'" (Dkt. #36 at p. 12-13).  Further, according to Defendants, "[m]erely substituting the word 'prices' for 'wages' does not transform the factual allegations from alleging a wage-fixing agreement to alleging a price-fixing agreement" (Dkt. #47 at p. 4).  But Defendants' narrow view of horizontal price-fixing agreements reveals the flaw in their arguments.

### A.  Price-Fixing Agreements Come in Many Forms.

The scope of conduct found to constitute horizontal price-fixing agreements warranting application of the *per se* rule is broad.  For example, courts have applied the *per se* rule to price-

fixing agreements: 1) establishing minimum prices, *United States v. Trenton Potteries Co*., 273 U.S. 392, 401 (1927); 2) setting maximum prices, *Maricopa Cnty*., 457 U.S. at 335; 3) fixing credit terms, *Catalano, Inc. v. Target Sales Inc*., 446 U.S. 643, 648 (1980); 4) setting fee schedules, *Goldfarb v. Va. State Bar*, 421 U.S. 773, 783 (1975); 5) purchasing surplus product to keep it off the market, *Socony-Vacuum*, 310 U.S. at 167; 6) refusing to advertise prices, *United States v. Gasoline Retailers Ass'n*, 285 F.2d 688, 691 (7th Cir. 1961); and 7) excluding purchasers unless they increased the price they paid for a service, *Fed. Trade Comm'n. v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 436 n.19 (1990). Thus, contrary to Defendants' argument, "price fixing" has not been limited to conduct that literally directly "fix[es] . . . the price of a commodity." (*See* Dkt. #36 at p. 13). Instead, as the above cases and many more have recognized, the definition of horizontal price-fixing agreements cuts broadly. As such, any naked agreement among competitors—whether by sellers or buyers—that fixes components that affect price meets the definition of a horizontal price-fixing agreement. *See Socony-Vacuum*, 310 U.S. at 221 ("Any combination which tampers with price structures is engaged in an unlawful activity."); *Jacobi v. Bache & Co., Inc*., 377 F. Supp 86, 95–96 (S.D.N.Y 1974) ("When the purpose of an agreement is to fix or stabilize prices, even if the means used affects only one element of the price structure, or only indirectly affects prices, the agreement is illegal per se . . . .")

The Court recognizes that the facts of this case do not present those typical of a price-fixing agreement. For example, the classic horizontal price-fixing scheme involves an agreement among sellers to fix the prices of goods they sell. But just because the typical price-fixing conspiracy involves certain hallmarks does not mean that other less prevalent forms of price-fixing agreements are not likewise unlawful. Indeed, Courts have not limited price-fixing conspiracies to agreements concerning the purchase and sale of goods but have found them to cover the purchase and sale of

services. *See Goldfarb*, 421 U.S. at 783 (finding that minimum fee schedule for lawyers services' "constitute[d] a classic illustration of price fixing"); *Superior Ct. Trial Laws. Ass'n*, 493 U.S. at 423 (finding that lawyers' boycott aimed at forcing increase of compensation paid to them was "the essence of 'price fixing[.]'"). More importantly, courts have also not only found price-fixing agreements among sellers, but also among buyers. *See Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.,* 334 U.S. 219, 235 (1948) ("It is clear that the agreement is the sort of combination condemned by the Act, even though the price-fixing was by purchasers, and the persons specially injured . . . are sellers, not customers or consumers."); *Nat'l Macaroni Mfrs. Ass'n v. Fed. Trade Comm'n.*, 345 F.2d 421, 426–27 (7th Cir. 1995) (finding a price-fixing agreement among manufacturers to standardize the composition of their product in an effort to depress the price of an essential raw material to be illegal *per se*). In sum, price-fixing agreements come in many forms and include agreements among competing buyers of services.

### B. The Sherman Act Prohibits Conspiracies Among Buyers of Labor.

The Supreme Court has made clear that the Sherman Act applies equally to all industries and markets—to sellers and buyers, to goods and services, and consequently to buyers of services—otherwise known as employers in the labor market. *See Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 361–65 (1926). More than a century ago, the Supreme Court recognized that the Sherman Act applies to labor markets. *Id.* In *Anderson*, along with other restraints that were imposed on the seamen to control their employment, the "[shipowners] fix[ed] the wages which shall be paid to the seamen." 272 U.S. at 362. The Court found that this conduct, along with the other restraints on labor by the employers, violated the Sherman Act. *Id.* at 365. Thus, there is little doubt that "[t]he Sherman Act . . . applies to abuse of market power on the buyer side . . . ." *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) (Sotomayor, J); *see also*

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 747 (11th Cir. 1998) ("That price fixing is equally violative of antitrust laws whether it is done by buyers or sellers is also undisputed.").

### C.  The Indictment Alleges a Price-Fixing Agreement That Is *Per Se* Illegal.

With these principles in mind, the Court turns to the Indictment to determine if it alleges a price-fixing agreement that is *per se* illegal. *MM Steel*, 806 F.3d at 847.  The Indictment alleges that "Jindal, Rodgers, and co-conspirators knowingly entered into and engaged in a conspiracy to suppress competition by agreeing to fix prices by lowering the pay rates to PTs and PTAs" (Dkt. #21 ¶ 11).  The Indictment thus alleges a naked price-fixing conspiracy among buyers in the labor market to fix the pay rates of the PTs and PTAs.  As such, the Indictment describes a price-fixing conspiracy that is *per se* unlawful. *See Socony-Vacuum*, 310 U.S. at 222 ("[T]he Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike.").   In other words, to summarize, the scope of anticompetitive conduct that constitutes price fixing is broad—it covers agreements among buyers in the labor market.  And the *per se* rule applies to naked price-fixing agreements categorically.  Accordingly, the Indictment sufficiently alleges a price-fixing conspiracy that warrants the *per se* rule.

### D.  Fixing the Price of Labor, or Wage Fixing, is a Form of Price Fixing and Thus Illegal *Per Se*.

Defendants do not dispute that price-fixing agreements are *per se* illegal; they do, however, challenge how the Government labeled the offense and whether the charged conduct constitutes a *per se* offense (Dkt. #36 at p. 8).  But, contrary to Defendants' argument, whether the Indictment refers to the "pay rates" of the PTs and PTAs as "prices" or "wages" does not affect the outcome. *See* L. Sullivan, Handbook of the Law of Antitrust, s 74, at 198 (1977) ("The antitrust laws concern substance, not form, in the preservation of competition.").  The antitrust laws fully apply to the

labor markets, and price-fixing agreements among buyers—like therapist staffing companies—are prohibited by the Sherman Act. *See Anderson*, 272 U.S. at 361–65.  At bottom, the alleged agreement between Defendants and co-conspirators had the purpose and effect of fixing the pay rates of the PTs and PTAs—the price of labor.  When the price of labor is lowered, or wages are suppressed, fewer people take jobs, which "always or almost always tend[s] to restrict competition and decrease output." *See Bus. Elecs. Corp.*, 485 U.S. at 723. This type of agreement is plainly anticompetitive and has no purpose except stifling competition. *See All Care Nursing Serv., Inc,* 135 F.3d at 748 ("The key to per se treatment is whether the conduct is of the kind that can only be anticompetitive.").  Indeed, "[b]uyers' cartels engaged in price fixing have been held to be illegal under the Sherman Act even though their goal is to lower the price of the input." *Int'l Outsourcing Servs, LLC v. Blistex, Inc*., 420 F. Supp. 2d. 860, 864 (N.D. Ill. 2006).

Additionally, contrary to Defendants' argument, that the Indictment lacks allegations that Defendants "made any agreement to fix prices paid by consumers" does not mean the Indictment fails to state a price-fixing agreement (*see* Dkt. #36 at p. 13).  The Sherman Act "does not confine its protection to consumers, or to purchasers, or to competitors, or sellers." *Mandeville*, 334 U.S. at 236.  Rather, the statute protects "all who are made victims of the forbidden practices by whomever they may be perpetrated," and those protections extend to sellers of goods and services—such as the PTs and PTAs—to the same extent they do buyers, consumers, or competitors. *Id.*  Besides, "[j]ust as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services." *Roman v. Cessna Aircraft Co*., 55 F.3d 542, 544 (10th Cir. 1995) (quoting II Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 377c (rev. ed. 1995)). As *Anderson* makes clear,

employees are no less entitled to the protection of the Sherman Act than are consumers. *See* 272 U.S. at 364–65.

Justice Kavanaugh's recent concurrence in *National Collegiate Athletic Ass'n v. Alston* provides further support for the conclusion that fixing the price of labor, or wage fixing, is a form of price fixing. 141 S. Ct. 2141 (2021).  In *Alston*, the Supreme Court addressed wage fixing by the NCAA—namely the NCAA's cap on education-related compensation that student-athletes are eligible to receive.  *Id.* at 2147.  In his concurrence, Justice Kavanaugh unequivocally asserts: "Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Id.* at 2167–68 (Kavanaugh, J., concurring) (citations omitted). Thus, in Justice Kavanaugh's mind, wage fixing is price fixing—price fixing of labor.  *See id.*

While Defendants correctly state that *Alston* does not classify wage fixing as a *per se* violation,[2] Justice Kavanaugh's concurrence is significant because he characterizes wage fixing as price fixing. *See id.*  And, "[i]t has long been settled that an agreement to fix prices is unlawful *per se*." *Catalano*, 446 U.S. at 647.  Thus, outside the extraordinary context at issue in *Alston*, naked horizontal agreements to fix the price of labor, like the agreement here, are ordinarily *per se* illegal.

---

[2] In *Alston*, the Supreme Court affirmed a judgment that evaluated the NCAA's limit on education-related compensation under the rule of reason. *Id* at 10–11 (majority opinion).  However, for many years, the Supreme Court has declined to condemn the NCAA's restraints as illegal *per se* because the "horizontal restraints on competition are essential if the product is to be available at all." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984).  In these situations—where collaboration is essential among certain actors for there to be a product at all—the rule of reason applies regardless of the nature of the restraint at issue. *See id.* at 103.  Accordingly, contrary to Defendants' argument, that the Supreme Court evaluated the NCAA's wage-fixing under the rule of reason does not justify the rule of reason in this case.

### E. Other Courts Have Recognized that Wage-Fixing Conspiracies Are *Per Se* Unlawful as Price-Fixing Agreements.

Other courts have also recognized that wage-fixing conspiracies—or horizontal agreements among buyers in the labor market—are illegal *per se* like other price-fixing agreements. *See Todd*, 275 F.3d at 198 ("If the plaintiff in this case could allege that defendants actually formed an agreement to fix [] salaries, [the] *per se* rule would likely apply."); *Law v. Nat'l Coll. Athletic Ass'n*, 134 F.3d 1010, 1017 (10th Cir. 1998) (finding that NCAA rule limiting salary of basketball coaches would ordinarily be a *per se* violation of § 1 of the Sherman Act); *In re Animation Workers Antitrust Litig*., 123 F. Supp. 3d 1175, 1179, 1213–14 (N.D. Cal. 2015) ("[T]he Court concludes that [p]laintiff[-employees] have alleged sufficient facts to support a plausible *per se* claim that [d]efendant[-employers] allegedly conspired to suppress the compensation of the putative class."); *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 624–25 (E.D. Mich. 2012) (noting plaintiffs and defendants agreed that wage fixing "like an analogous horizontal price-fixing conspiracy" should be characterized as a *per se* violation); *Fleischman v. Albany Med. Ctr*., 728 F. Supp. 2d. 130, 157 (N.D.N.Y. 2010) ("Generally, price-fixing [or in this case wage-fixing] agreements are considered a per se violation of the Sherman Act.") (alterations in original) (internal quotations and citations omitted); *Doe v. Ariz. Hosp. & Healthcare Ass'n,* No. CV07-1292, 2009 WL  1423378, at *3–4 (D. Ariz. Mar. 19, 2009) (finding complaint that alleged defendant-hospitals conspired to keep temporary nursing wages below free market level should survive motion to dismiss because agreement was a *per se* illegal price-fixing agreement); *Cordova v. Bache & Co*., 321 F. Supp. 600, 606 (S.D.NY. 1970) ("There can be little doubt about the fact that if a group of employers, as the complaint here alleges, were allowed . . . to agree together to reduce the commissions paid to their respective employees, they would have the same power to restrain competition as is inherent in a price-fixing agreement.").

Though Defendants take issue with the fact that all the cases that have labeled wage fixing as a *per se* violation are civil cases, (*see* Dkt. #47 at p. 5), the distinction is irrelevant.  Just because this is the first time the Government has prosecuted for this type of offense does not mean that the conduct at issue has not been illegal until now.  Rather, as these cases indicate, price-fixing agreements—even among buyers in the labor market—have been *per se* illegal for years.

### F.  There is Sufficient Judicial Experience with Price Fixing to Justify a *Per Se* Designation.

Defendants misapprehend the role of judicial experience in applying a *per se* designation to certain conduct. Defendants contend that agreements are deemed unlawful *per se* "only after courts have had considerable experience with the type of restraint at issue" (Dkt. #36 at p. 10) (quoting *Leegin*, 551 U.S. at 886).  As a result, because neither the Supreme Court nor any Court of Appeals has ever determined whether a purported wage-fixing agreement is *per se* unlawful under § 1 of the Sherman Act, Defendants argue there is insufficient judicial experience with wage fixing to justify a *per se* designation (Dkt. #36 a p. 9).  Defendants are mistaken.

Judicial experience informs the decision to recognize a "*new per se* rule." *See Maricopa Cnty.*, 457 U.S. at 350 n.19 (emphasis in original).  Price-fixing agreements, as horizontal restraints, have long been held to merit a *per se* designation. *Socony-Vacuum*, 310 U.S. at 218.  Thus, courts "have [] considerable experience with the *type of restraint* at issue"—price-fixing agreements. See *Leegin*, 551 U.S. at 886 (emphasis added).  As courts have recognized, price-fixing agreements come in many forms.  *See supra* pp. 8–10.  And though no appellate court has ever specifically found that a price-fixing agreement among employers in the labor market is *per se* illegal does not mean the Court is recognizing a new *per se* rule. *See United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000) ("Yet the fact that the lysine producers' scheme did not fit precisely the characterization of a prototypical *per se* practice does not remove it from *per se*

treatment."). Rather, a restraint that is "tantamount to" *per se* unlawful conduct "falls squarely within the tradition *per se* rule." *Catalano*, 446 U.S. at 648. Similarly, here, an agreement to fix the price of labor is "tantamount" to an agreement to fix prices, and "thus falls squarely within the traditional *per se* rule against price fixing." *See id*. Besides, the Supreme Court has explicitly rejected arguments like Defendants': "[T]he argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules . . . ." *Maricopa Cnty*., 457 U.S. at 351.

Moreover, Defendants further argue that "[t]he need for further judicial experience and analysis is also evident" in light of the possibility that wage-fixing could "benefit[] consumers downstream through lower prices" and "encourage, rather than discourage, competitors" (Dkt. #36 at p. 11). In other words, *per se* designation is not appropriate because Defendants' conduct cannot be said to "lack any redeeming virtue" (Dkt. #36 at p. 11) (internal citations omitted). But the Supreme Court has also rejected similar arguments.

For example, in *Catalano*, the Supreme Court explicitly rejected similar procompetitive justifications that the court of appeals had relied upon—namely that the anticompetitive behavior at issue might actually decrease prices for consumers and increase competition by removing a barrier to market entry. *Id.* at 649–50. The Court stated that "[w]hile it may be that the elimination of a practice of giving variable discounts" may ultimately lead to a decrease in the invoice price, "[i]t is more realistic to view an agreement to eliminate credit sales as extinguishing one form of competition among the sellers." *Id.* at 649. Similarly, here, though an agreement to fix the price of labor could benefit consumers, "that is surely not necessarily to be anticipated" and that will not prevent it from being declared unlawful *per se*. *See id.* Undeniably, "Supreme Court jurisprudence is clear: where the per se rule applies, it is of no consequence that an agreement could potentially

bring net economic benefits to some part of the market . . . ." *Kemp & Assocs., Inc.* 907 F.3d at 1277.

Further, in *Catalano*, the Supreme Court rejected the justification that an agreement to eliminate the practice of giving credit could actually enhance competition by removing a barrier to entry for other sellers. 446 U.S. at 649.  The Court reasoned, "it would seem to follow that the more successful an agreement is in raising the price level [or curtailing production], the safer it is from antitrust attack. Nothing could be more inconsistent with our cases." *Id.*  Again, similarly, Defendants' argument that an agreement to fix the price of labor may "encourage, rather than discourage, competitors" misses the mark (*see* Dkt. #36 at p. 11).  Time and time again, the Supreme Court has reiterated, "when a particular concerted activity entails an obvious risk of anticompetitive impact with no apparent potentially redeeming value, the fact that a practice may turn out to be harmless in a particular set of circumstances will not prevent its being declared unlawful *per se*." *Catalano*, 446 U.S. at 649.

### G. Count One of the Indictment Sufficiently Charges a Conspiracy to Fix Price.

Since the Court has found that the allegations in the Indictment constitute a *per se* offense, the Court must next review the Indictment to determine whether it is legally sufficient on its face. To prove a *per se* violation of 15 U.S.C. § 1, the Government must prove that (1) the defendant knowingly formed, joined, or participated in a contract, combination, or conspiracy; (2) its purpose was to fix, raise, maintain, or stabilize prices; and (3) the activities subject to the conspiracy occurred in the flow of interstate commerce or substantially affected interstate commerce. 15 U.S.C. § 1; *Socony-Vacuum*, 310 U.S. at 219–20, 223; *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 679, 681 (5th Cir. 1981).

Count One tracks the elements of a *per se* violation of 15 U.S.C. § 1.  It alleges that Defendants knowingly formed, joined, or participated in a conspiracy, that the conspiracy was meant to suppress competition by agreeing to fix prices,[3] and that the business activities occurred within the flow of, and substantially affected, interstate trade and commerce.[4]  The Indictment therefore is legally sufficient on its face.  It contains the "essential elements of the offense charged, [] the elements are described with particularity, without any uncertainty or ambiguity, and [] the charge is specific enough to protect Defendants against a subsequent prosecution for the same offense." *United States v. Lavergne*, 805 F.2d 517, 521 (5th Cir. 1986).

Thus, Count One of the Indictment sufficiently alleges facts constituting a *per se* violation of the Sherman Act.  Because the Court has found that the Indictment properly alleges a *per se* violation of the Sherman Act, the Court now turns to Defendants' next argument as to why the Court should dismiss Count One.

## II. Constitutional Issues

Defendants argue that application of the *per se* rule is unconstitutional because it violates the Fifth and Sixth Amendments of the U.S. Constitution (Dkt. #36 at p. 15).  Specifically, first, Defendants argue the Indictment violates the Fifth Amendment because it "violates the rule of lenity and fails to give fair warning of the prohibited conduct" (Dkt. #36 at pp. 15–16).  Second, Defendants argue the Indictment violates the Sixth Amendment because it "improperly promotes

---

[3] ". . . Jindal, Rodgers, and co-conspirators knowingly entered into and engaged in a conspiracy to suppress competition by agreeing to fix prices by lowering the pay rates to PTs and PTAs" (Dkt. #21 at pp. 3–4).

[4] "During the Relevant Period, the business activities of Jindal, Rodgers, and their co-conspirators that are the subject of the conspiracy charged in this Count were within the flow of, and substantially affected, interstate trade and commerce. For example, during the Relevant Period: (a) Insurance funds, including federal Medicare funds, traveled from banks or companies located in states outside of Texas through a home health agency to Company A in Texas, and from Company A to its PTs and PTAs to pay them for providing care to patients; (b) To provide care in patients homes and assisted living facilities, PTs and PTAs used equipment and vehicles purchased in interstate commerce; and (c) The conspiracy was intended to lower rates paid to PTs and PTAs, which would lessen their purchases in interstate trade and commerce" (Dkt. #21 at p. 6).

a presumption of intent, vitiating the requirement of proof of state of mind in the criminal context"
(Dkt. #36 at p. 16).  The Court will address each argument in turn.

### A.  Defendants' Fifth Amendment Challenges Fail.

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or
otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . nor be
deprived of life, liberty, or property without due process of law . . . ." U.S. CONST. amend. V.  As
embodied by the "fair warning requirement," due process requires that "no man shall be held
criminally responsible for conduct which he could not reasonably understand to be proscribed."
*United States v. Lanier*, 520 U.S. 259, 265 (1997) (internal quotations omitted).

The Supreme Court has identified "three related manifestations of the fair warning
requirement." *Id*. at 266.  "First, the vagueness doctrine bars enforcement of a statute which either
forbids or requires the doing of an act in terms so vague that men of common intelligence must
necessarily guess at its meaning and differ as to its application." *Id*. (internal quotations omitted).
Second, the rule of lenity "ensures fair warning by so resolving ambiguity in a criminal statute as
to apply it only to conduct clearly covered." *Id*. (citations omitted).  And third, "due process bars
courts from applying a novel construction of a criminal statute to conduct that neither the statute
nor any prior judicial decision has fairly disclosed to be within its scope." *Id*. (citations omitted).
To satisfy each of these requirements, a criminal statute, "standing alone or as construed" must
"ma[k]e it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at
267.

Defendants do not contend that the Sherman Act itself is unconstitutionally vague; rather,
they argue that the Indictment violates the second and third manifestations of the fair warning
requirement (Dkt. 47 at pp. 10–11).  According to Defendants, because no court has found that

purported wage-fixing agreements constitute criminal conduct and neither the Supreme Court nor any Court of Appeals has held wage fixing to be *per se* unlawful, then Defendants "could not possibly have had fair warning that the conduct alleged in the Indictment may be criminal" (Dkt. #36 at p. 18).  Further, Defendants argue that because there is "a grievous uncertainty as to whether the Supreme Court condemns wage fixing as a *per se* antitrust violation," the rule of lenity mandates dismissal (Dkt. #47 at p. 11).  In response, the Government argues "[t]his is not even close" because "the Supreme Court has long recognized that wage fixing is price fixing" (Dkt. #46 at p. 15 (citing *Anderson*, 272 U.S. at 361–63; *Superior Ct.*, 493 U.S. at 423, 427, 432, 436 n.19)). While the issue is not as clear-cut as the Government suggests, Defendants' constitutional arguments fail.

### i.    The Defendants Received Fair Notice That Their Conduct Was Illegal.

The Indictment charges Defendants with price fixing.  For more than 100 years, courts have repeatedly held price fixing as *per se* illegal under the Sherman Act. *Socony-Vacuum.*, 310 U.S. at 218.  Thus, Defendants could not have had any reasonable doubt that any price-fixing agreement was *per se* illegal.  Defendants do not dispute this conclusion and instead insist that the "novel construction of the statute to construe *'wage fixing'* as *per se* unlawful . . . fails to give fair warning of the prohibited conduct" (Dkt. #36 at p. 15) (emphasis added).  But this argument relies on the same semantical arguments this Court already rejected.  *See supra* Part I.

Regardless of whether the Indictment characterizes Defendants' conduct as wage fixing or price fixing, the Sherman Act, in conjunction with the decades of case law, made it "reasonably clear" that Defendants' conduct was unlawful. *See Lanier*, 520 U.S. at 267.  Indeed, most criminal statutes "deal with untold and unforeseen variations in factual situations," so "no more than a reasonable degree of certainty can be demanded." *Boyce Motor Lines v. United*

*States*, 342 U.S. 337, 340 (1950).  Belaboring the point discussed in Part I, the Supreme Court has long recognized that price-fixing agreements come in many forms. *See Catalano*, 446 U.S. at 647–50; *see also supra* Part I pp. 8–10.   And the Supreme Court has long recognized that § 1 categorically prohibits *per se* unlawful restraints across all markets and industries—including restraints on the buyer side and in the labor market. *See Mandeville*, 334 U.S. at 235–36; *Anderson*, 272 U.S. at 361–63; *see also supra* Part I pp. 9–11.  Thus, decades of precedent gave Defendants more than sufficient notice that agreements among competitors to fix the price of labor are *per se* illegal.   Moreover, the numerous district court decisions holding that agreements to fix the compensation of employees are *per se* unlawful reinforce this conclusion. *See supra* Part I. p. 14. At a minimum, these decisions foreclose Defendants' argument because it cannot be said that "no[] [] prior judicial decision has fairly disclosed [Defendants' conduct] to be within [the] scope [of the Sherman Act]." *See Lanier*, 520 U.S. at 266.

Moreover, the holding today is not a "novel" construction of the Sherman Act—it comports with previous broad interpretations of the Act and is a logical application of precedent.  Similarly, that "no court has found that purported wage-fixing agreements constitute criminal conduct under the Sherman Act" does not mean that Defendants' did not have fair notice. *See United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir.1995) ("The claimed novelty of this prosecution does not help [defendant's fair notice argument], for it is immaterial that there is no litigated fact pattern precisely on point.") (internal quotations omitted).  Rather, the lack of criminal judicial decisions only indicates Defendants' unlucky status as the first two individuals that the Government has prosecuted for this type of conduct before.

But, "[t]o find unfair notice whenever a court specified new types of acts to which a criminal statute applied would stifle courts' ability to interpret and fairly apply criminal statutes."

*United States v. Kay*, 513 F.3d 432, 444–45.  Rather, "as *Lanier* points out, lack of prior court interpretations 'fundamentally similar' to the case in question does not create unfair notice." *Id.* at 444.  Instead, "so long as the prior decisions gave reasonable warning" that the conduct was unlawful, then fair notice was satisfied. *See id.*  And, here, decades of judicial interpretations gave Defendants more than "reasonably clear" notice that their conduct was unlawful. *See Lanier*, 520 U.S. at 267.

Even where the Supreme Court has considered certain conduct "not price fixing as such," it has affirmed the district court's application of the *per se* rule. *United States v. Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. 681, 692, 699 (1978).  Thus, even accepting Defendants' argument that their conduct was not literally price fixing, Defendants were still on notice that their conduct was "perilously close" to a line that subjected them to criminal prosecution. *See Boyce*, 342 U.S. at 331; *Id.* ("Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.").  Thus, Defendants received fair notice that their conduct was illegal.

### ii.   The Rule of Lenity Does Not Apply.

Defendants also argue that the rule of lenity requires dismissal of Count One because there remains a "grievous uncertainty as to whether the Supreme Court condemns wage fixing as a *per se* antitrust violation" since "it has never evaluated it as such" (Dkt. #47 at p. 11).  The Government responds by arguing that the rule of lenity is inapplicable here because "[t]here is no grievous ambiguity or uncertainty in this case" (Dkt. #46 at p. 15).

The rule of lenity is a principle of statutory construction that "applies primarily to the interpretation of criminal statutes." *Kasten v. Saint-Gobain Performance Plastics Corp*., 563 U.S. 1, 16 (2011).  It dictates that courts resolve ambiguities in criminal statutes in favor of defendants.

*See Crandon v. United States*, 494 U.S. 152, 168 (1990).  But "[c]ourts do not resort to the rule of lenity every time a difficult issue of statutory interpretation arises." *United States v. Bittner*, 469 F. Supp. 3d. 709, 723 (E.D. Tex. 2020) (citation and internal quotation marks omitted).  "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted).

Here, the rule of lenity has no application.  As discussed, the rule of lenity applies only if a court can make "no more than a guess as to what Congress intended." *Ladner v. United State*s, 358 U.S. 169, 178 (1958).  Here, the Court can do much better than "guess." *See id.*  Indeed, the Supreme Court has recognized that "Congress intended to strike as broadly as it could in § 1 of the Sherman Act . . . ." *Goldfarb*, 421 U.S. at 787.  And price-fixing agreements—in many forms— have long been held to be *per se* violations of the Act.  *See Catalano*, 446 U.S. at 647–50; *see also supra* Part I pp. 8–10.  The Supreme Court has also long held that the Sherman Act applies equally to all industries and markets—including to agreements made by buyers in the labor market. *See Mandeville*, 334 U.S. at 235–36; *Anderson*, 272 U.S. at 361–63; *see also* supra Part I pp. 9–11. Thus, these cases leave no room for application of the rule of lenity.  Put bluntly, "the rule of lenity cannot be used to create ambiguity when the meaning of a law, even if not readily apparent, is, upon inquiry, reasonably clear." *United States v. Nippon Paper Industries Co*., 109 F.3d 1,8 (1st Cir. 1997).  Though Defendants disagree with this Court's interpretation of the Sherman Act, that does not mean there is a "grievous ambiguity." *See Barber*, 560 U.S. at 488.   Rather, decades of precedent make it clear that agreements to fix the price of labor—like all other price-fixing agreements—are *per se* illegal.  Thus, the rule of lenity does not apply.

**B.  Defendants' Sixth Amendment Challenge Also Fails.**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. CONST. amend. VI. Defendants argue that the Indictment's *per se* designation violates the Sixth Amendment because it "improperly suggest[s] that intent could be presumed without further evidence" (Dkt. #36 at p. 20).  According to Defendants, such a presumption would unconstitutionally take from the jury the determination of intent—thus depriving Defendants of their right to trial by jury (Dkt. #36 at p. 20).  The basis of Defendants' argument stems from *United States v. U.S. Gypsum Co.*, where the Supreme Court held "that a defendant's state of mind or intent is an element of a criminal antitrust offense" which "cannot be taken by the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices." 438 U.S. at 435.  But Defendants' cursory Sixth Amendment argument also fails.

Decades ago, the Fifth Circuit rejected essentially the same argument that Defendants now make. *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 681–84 (5th Cir. 1981). Defendants fail to acknowledge, much less distinguish, this precedent.   In *Cargo Service*, defendants were charged with a conspiracy to fix prices and subsequently found guilty after a jury trial. *Id.* at 678.  On appeal, relying on *Gypsum*, defendants argued that they were denied due process of law because the district court's jury instruction "improperly allowed the jury to convict absent a finding of intent" *Id.* at 684.  The Fifth Circuit rejected this argument: "Neither a conclusive nor a permissive presumption is at issue here" because "a finding of intent to fix prices [equates to] an intent to unreasonably restrain trade." *Id.* at 683 n.7.  Thus, "a finding that [defendants] intended to fix prices supplies the criminal intent necessary for a conviction of a criminal antitrust offense." *Id.* at 684.  Further, the Fifth Circuit found the Defendants' reliance on

*Gypsum* was misplaced—*Gypsum* was "easily distinguishable" because it involved the mere exchange of price information, not price fixing itself, and thus was a rule of reason case. *Id.* at 683. This Court thus finds that *Cargo Service* forecloses Defendants' argument.[5]   Accordingly, application of the *per se* rule does not violate the Sixth Amendment.

Since the Court has addressed both Defendants' arguments pertaining to Count One, the Court will now turn to Rodgers' separate argument.

## ANALYSIS: RODGERS' MOTION

In addition to adopting Jindal's arguments for Count One, Rodgers moves to dismiss the entire Indictment against him on another ground (Dkt. #45).   Specifically, Rodgers argues the Indictment should be dismissed because the Government's prosecution breaches an oral non-prosecution agreement between Rodgers and the Government (Dkt. #45).   In response, the Government denies the existence of an oral non-prosecution agreement (Dkt. #48).   In fact, the Government contends that the only agreements between Rodgers and the Government were two no-direct use agreements ("NDU's"), commonly referred to as "proffer letters" (Dkt. #48 at p.3).

### I.   Rodgers' Background

Details of the events between Rodgers, his attorney, and the Government are helpful for context regarding the alleged non-prosecution agreement.   Based on a declaration from Brian Poe ("Poe"), Rodgers' attorney, and a declaration from Ryan Danks ("Danks"), Acting Chief of the Washington Criminal I Section of the Antitrust Division, the Court summarizes the following background information (Dkt. #45-8; Dkt. #48-1).

---

[5] Moreover, every other circuit to address this issue has agreed. *United States v. Giordano*, 261 F.3d 1134, 1143–44 (11th Cir. 2001); *United States v. Fishbach & Moore, Inc*., 750 F.2d 1183, 1195–96 (3d. Cir. 1984); *United States v. Koppers Co.*, 652 F.2d 290, 293–95 (2d Cir. 1981); *United States v. Brighton Bldg. & Maint. Co*., 598 F.2d 1101, 1106 (7th Cir. 1979); *United States v. Mfrs.' Ass'n*, 462 F.2d 49, 52 (9th Cir. 1972).

On November 26, 2019, DOJ Trial Attorney Katie Stella ("Stella") contacted Poe and the two spoke on the phone following a brief email exchange (Dkt. #45-8 ¶ 2).  During the phone call, Stella stated that the Government considered Rodgers to be a "subject" of a criminal investigation and wanted to interview Rodgers in connection with an antitrust investigation.  (Dkt. #45-8 ¶ 2).  According to Poe's declaration, Stella also stated that "she did not anticipate Rodgers being charged if he continued to cooperate with the government's investigation" (Dkt. #45-8 ¶ 2).  Danks' declaration does not mention this phone call.

On December 12, 2019, Rodgers and Poe met with the Government in Fort Worth for an interview or "proffer" (Dkt. #45-8 ¶ 4).  A written NDU was executed before the interview on the same day, setting out the terms of the interview (Dkt. #48-1 ¶ 6; Dkt. #48, Exhibit 2).  Poe's declaration does not mention the written NDU.  Following Rodgers' proffer, Poe and the Government communicated several times via phone and email (Dkt. #45-8 ¶ 6).  On May 22, 2020, Poe received a phone call from Stella concerning Rodgers (Dkt. #45-8 ¶ 7).  During the call, Poe claims that Stella confirmed that Rodgers was still considered a "subject" of the criminal investigation and stated again that Rodgers would not be charged criminally if he continued to cooperate with the Government's investigation (Dkt. #45-8 ¶ 7).  Again, Danks' declaration contains no mention of this call.

On or about December 9, 2020, Poe states he received a phone call from DOJ Antitrust Trial Attorney Megan Lewis ("Lewis") regarding Rodgers (Dkt. #45-8 ¶ 9).  The purpose of the call was to inform Poe that a Grand Jury had indicted Jindal and that the Government anticipated Rodgers would need to testify at trial (Dkt. #45-8 ¶ 9; Dkt. #45-1 ¶ 7).  Poe claims that while he had been previously assured by Stella that Rodgers would not be charged if he continued to cooperate, he took the opportunity to confirm this with Lewis since she was Stella's supervisor

(Dkt. #45-8 ¶ 9).  According to Poe's declaration, "Lewis unequivocally stated that Rodgers would not be charged if he continued to cooperate with the [G]overnment" (Dkt. #45-8 ¶ 9).  Danks admits the Government contacted Poe on that day, but his declaration contains no further details of the substance of the conversation (Dkt. #48-1 ¶ 7).  He does state, however, that the Government attorney with whom Poe spoke was not Lewis, nor was the attorney a supervisor of another attorney who worked on the investigation (Dkt. #48-1 ¶ 7).

On January 27, 2021, Rodgers and Poe attended a virtual proffer with the Government (Dkt. #45-8 ¶ 11).  As with the first proffer, another NDU was executed setting out terms of the interview (Dkt. #48-1 ¶ 9; Dkt. #48, Exhibit 3).  Again, Poe's declaration contains no mention of the written agreement that was executed that day.  Subsequently, on a March 1, 2021 phone call, the Government notified Poe that it was recommending prosecution for Rodgers because, in the Government's view, Rodgers had not been truthful during the proffer on January 27, 2021 (Dkt. #45-8 ¶ 12; Dkt. #48-1 ¶ 10).  Rodgers was indicted on April 15, 2021 (Dkt. #45-8 ¶ 14).

## II.    Non-Prosecution Agreement Legal Standard

"Non[-]prosecution agreements, like plea bargains, are contractual in nature, and are therefore interpreted in accordance with general principles of contract law." *United States v. Castaneda*, 162 F.3d 832, 835 (5th Cir. 1998). Applying contract law, Rodgers "bears the burden of proving that there was a mutual manifestation of assent—either verbally, or through conduct— to the agreement's essential terms." *United States v. Jimenez*, 256 F.3d 330, 347 (5th Cir. 2001).

If Rodgers proves that there was a non-prosecution agreement and "lives up to his end of the bargain, the government is bound to perform its promises." *Castaneda*, 162 F.3d at 835–36. If Rodgers "'material breaches' his commitments under the agreement, however, the government can be released from its reciprocal obligations." *Id*. at 836. To be relieved of its obligations, the

Government must "prove to the court by a preponderance of the evidence that (1) the defendant breached the agreement, and (2) the breach is sufficiently material to warrant rescission." *Id.*

## III.    Analysis

Armed with a better understanding of the communication between Rodgers' counsel, Poe, and the Government, the Court turns back to Rodgers' argument.  Rodgers claims there was an oral non-prosecution agreement that was "reached on or about December 9, 2020" "that Rodgers would not be charged if [he] continued to cooperate, which included testifying at trial" (Dkt. #50 at p. 6).  Rodgers further contends that the Government has not proved that Rodgers breached the terms of his non-prosecution agreement (Dkt. #45 at p. 9).  Accordingly, Rodgers argues the Government cannot rescind the agreement (Dkt. #45 at p. 9).  The Government counters by arguing that no oral agreement was ever reached (Dkt. #48 at p. 10).  The Government also argues that two written NDUs "conclusively establish that Rodgers did not have a non-prosecution agreement" "[b]ecause parol evidence is inadmissible to prove the meaning of the unambiguous NDUs" (Dkt. #48 at p. 10).  Further, while the Government has not come forward with any evidence proving Rodgers violated any alleged oral agreement, it argues that "[i]f necessary" it "could readily show a material violation of any non-prosecution agreement" (Dkt. #48 at p. 13).

Applying basic contract principles to the alleged agreements in this case, in order to dismiss the Indictment, the Court must 1) find that the parol evidence rule does not bar the enforcement of the alleged oral non-prosecution agreement; 2) an oral non-prosecution agreement was in fact reached; 3) Rodgers performed his part of the agreement; and 4) the Government has breached the agreement.[6]  *See Jimenez*, 256 F.3d at 347 n.23 (noting that before considering whether any alleged

---

[6] The parties did not address choice of law questions.  The Court, however, is bound by *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) to apply the contract law of the State of Texas, where was the agreement was allegedly executed and where it would be performed. *United States v. McBride*, 571 F. Supp. 596, 604 n.3 (S.D. Tex. 1983), *aff'd*, 915 F.2d 1569 (5th Cir. 1990)

agreement was breached, it must first be determined whether an agreement ever existed). Thus, the Court will first consider the effect of the written NDUs as part of its inquiry into whether an oral non-prosecution agreement was ever reached.

### A. The Two Written NDUs Do Not Bar Enforcement of Any Alleged Oral Agreement.

As previously stated, the Government argues that two written NDUs between the Government and Rodgers trigger the parol evidence rule and thus "conclusively establish that Rodgers did not have a non-prosecution agreement" (Dkt. #48 at p. 10).   According to the Government, because the NDUs contemplate Rodgers' potential prosecution and contain merger clauses, they "foreclose any contention that there was a non-prosecution agreement at the time of their signing" (Dkt. #48 at p. 10).   In his motion to dismiss the Indictment, Rodgers does not mention the written NDUs.  In his reply, however, Rodgers concedes that the written NDUs exist, but cites no law on the parol evidence rule and instead just repeatedly asserts that the Government "misconstrue[s] the language of these agreements" (Dkt. #50 at p. 5).

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the writing itself. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).  Parties may not rely on extrinsic evidence to create an ambiguity or give the contract a different meaning from that which its language imports. *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017).   "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Likewise, "when a contract is unambiguous, [courts] generally will not look beyond the four corners of the document." *United States v. Long*, 722 F.3d 257, 262 (5th Cir. 2013) (internal quotations omitted).   Further, when there is valid integrated agreement with respect to a particular

subject matter, the parol evidence rule "precludes the enforcement of inconsistent prior or contemporaneous agreements." *Jack H. Brown & Co. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir. 1990).  However, the parol evidence rule "does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof." *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32 (Tex. 1958).

As a starting point, only the second NDU—executed on January 22, 2021—would trigger the parol evidence rule and thus bar enforcement of the alleged oral non-prosecution agreement. The first NDU was executed on December 12, 2019, (Dkt. #48, Exhibit 2), and Rodgers claims the oral agreement was not reached until about one year later—on or about December 9, 2020 (Dkt. #50 at p. 6).   Yet, the parol evidence rule only bars enforcement of prior or contemporaneous agreements; it does not apply to agreements made *subsequent* to the written agreement. *Brumitt*, 519 S.W.3d at 111. Thus, only the second written NDU, executed on January 22, 2021, could trigger the parol evidence rule since the oral agreement was allegedly formed before the second written NDU was signed.

Moreover, the second NDU is the type of agreement that triggers the parol evidence rule. It is a written agreement that is "integrated."  Indeed, it contains an integration or "merger" clause. *See People's Cap. & Leasing Corp. v. McClung*, No. 4:18-CV-00877, 2020 WL 4464503, at *8 (E.D. Tex. Aug. 4, 2020) ("A merger clause is a provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document.") (internal quotations omitted).  But, as well, by its own terms, it is integrated only as to the parties' agreements relating to the subject matter it addresses—not as to all prior or contemporaneous agreements between the parties related to other matters. *See West v.*

*Quintanilla*, 573 S.W.3d 237, 244 (Tex. 2019) ("Although it is complete and final as to its subject matter, it does not purport to address or supersede agreements related to other matters.").  In this sense, the NDU is only partially integrated.  The language in the NDU makes this clear.  For example, it states:

> It is understood that this agreement is limited to statements made during the interview on January 27, 2021, and does not apply to any oral, written, or recorded statements made by you at any other time. This letter and the attached Addendum constitute the entire understanding between the United States and you *in connection with this interview*.

(Dkt. #48, Exhibit 3) (emphasis added).  Accordingly, though the NDU unambiguously states that it "constitute[s] the entire understanding between the United States and [Rodgers,]" it does so only in connection with the terms of the January 22, 2021, proffer meeting (*See* Dkt. #48, Exhibit 3). Thus, even though the NDU contains an integration clause, it does not foreclose the possibility that Rodgers and the Government reached another separate, unrelated agreement.

This is significant because under the parol evidence rule, the written, integrated NDU only "precludes enforcement of any prior or contemporaneous agreement that addresses the same subject matter and is inconsistent with [the NDUs'] terms." *Id.* at 244–45.  Stated differently, the parol evidence rule does not preclude enforcement of a prior agreement that is "collateral to and not inconsistent" with the NDU. *Id.* at 245.  Therefore, to determine if the parol evidence rule bars enforcement of the oral agreement, the Court must determine whether the alleged oral agreement was "collateral" to the NDU and whether it was "not inconsistent" with it. *See id*.

Here, the Court finds that any alleged oral non-prosecution agreement was "collateral" to the second NDU.  To be collateral, the agreement must be one the parties might naturally make separately and would not be ordinarily be expected to be embodied in or integrated with the written agreement and not so clearly connected with the principal transaction as to be part and parcel of

it. *Boy Scouts of Am. v. Responsive Terminal Sys., Inc.*, 790 S.W.2d 738, 745 (Tex. App.—Dallas 1990, writ withdrawn).  Here, the NDU and the oral agreement addressed different subject matters. An NDU is generally "an agreement between an [individual] and the government in a criminal case that sets forth the terms under which the [individual] will provide information to the government during an interview, commonly referred to as a 'proffer session.'" *United States v. Lopez*, 219 F.3d 343, 345 n.1 (4th Cir. 2000).  On the other hand, a non-prosecution agreement is exactly what it sounds like—it is an agreement that states the Government will agree not to prosecute an individual if certain conditions are met (Dkt. #48-1 ¶3).  Thus, the NDU agreement addressed the terms of the proffer session, while the alleged oral agreement would have addressed the terms of any protection from prosecution.  Even in the Government's own words, "[n]on-prosecution agreements differ markedly from NDUs" (Dkt. #48 at p. 4).  Consequently, because the oral non-prosecution agreement was collateral to the written NDU, the Court must resolve whether the oral non-prosecution agreement was inconsistent with the terms of the NDU. *See Quintanilla*, 573 S.W.3d at 244–45.  If the oral non-prosecution agreement was "not inconsistent" with the NDU, then the parol evidence rule will not preclude enforcement of the oral agreement. *Id.*

The Court turns to the language of the NDU to determine if it is consistent with the alleged oral agreement that Rodgers would not be prosecuted if he continued to cooperate.  In relevant part, the agreement states:

> 3.      The United States agrees that no statement made by you during the interview will be used directly against you in any legal proceeding, except that your statements may be offered in any such proceeding to impeach your testimony or to rebut evidence offered on your behalf.  In addition, the United States may use any statements made in the interview in a prosecution of you for making a false statement or declaration (18 U.S.C. §§ 1001, 1623), obstruction of justice (18 U.S.C. § 1503, *et seq.*), or perjury (18 U.S.C. § 1621).

>   4.     The United States is free to use any information directly or indirectly derived from the interview to pursue its investigation and in any subsequent prosecution of you or others.

(Dkt. #48, Exhibit 3).  The language, particularly in paragraph four, broadly contemplates future prosecution of Rodgers.  At first glance, this broad language appears to be inconsistent with the Government's oral promise not to prosecute Rodgers.  But, after a closer examination of the language, the Court reaches a different conclusion.  Instead, the Court finds that the collateral oral agreement at issue is "not inconsistent" with the written NDU—even though the NDU contemplates future prosecution of Rodgers. Indeed, in *Quintanilla*, the Texas Supreme Court explored what "inconsistent" means in this context and found that when the oral agreement contradicts or varies the parties' obligations under the written agreement, the oral agreement is an inconsistent collateral agreement. *Id.* at 247.

Here, the alleged oral agreement does not vary the parties' obligations under the written NDU.  For one thing, the NDU does not specifically state that Rodgers is subject to a future prosecution; it simply states the Government can use the information from the interview in any subsequent prosecution (Dkt. #48, Exhibit 3).  Further, the alleged oral agreement was not simply an agreement to not prosecute Rodgers—it was conditioned on his continued cooperation.  Thus, just like the NDU contemplates future prosecution of Rodgers, so, too, does the alleged oral agreement—if Rodgers fails to continue to cooperate. As such, the oral agreement does not alter fundamental terms of the NDU.

Consequently, because the alleged oral non-prosecution agreement is "collateral to and not inconsistent" with the second NDU, the parol evidence rule does not preclude enforcement of it. *See id*. at 245.  Accordingly, since the parol evidence rule is not applicable, the Court now turns

to whether Rodgers has proved that there was a legally enforceable oral non-prosecution agreement.

### B.  No Legally Enforceable Oral Non-Prosecution Agreement Was Reached.

A defendant claiming to have a non-prosecution agreement bears the burden of "prov[ing] that such an agreement existed." *Jimenez*, 256 F.3d at 347.  "Non-prosecution agreements . . . are contractual in nature, and are therefore interpreted in accordance with general principles of contract law." *Castaneda*, 162 F.3d at 835.  Any "ambiguities" in a non-prosecution agreement "must be construed against the government." *McBride*, 571 F. Supp. at 605.  Because a non-prosecution agreement is governed by contract law standards, whether the parties reached an agreement is question of fact. *Westlake Petrochemicals, L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 238–39 (5th Cir. 2012).  However, whether an agreement has all the essential terms to be an enforceable agreement is a question of law. *Coe v. Chesapeake Expl., L.L.C.*, 695 F.3d 311, 320 (5th Cir. 2012).  In other words, Rodgers' contention has both a factual dimension—namely, whether Rodgers and the Government agreed that the Government would not prosecute him if he cooperated—and a legal dimension—whether there was a meeting of minds on the agreement's essential terms.

Rodgers claims the oral agreement "that Rodgers would not be charged if Rodgers continued to cooperate, which included testifying at trial" was reached "on or about December 9, 2020" (Dkt. #50 at p. 6).  In other words, Rodgers argues that the basis for the oral agreement was Poe's phone call with Lewis.  Further, Rodgers asserts that the Government's failure to deny the occurrence of the oral conversation and the Government's failure to deny that an agreement was reached "is further proof to corroborate counsel's declaration" (Dkt. #50 at p. 6).  Indeed, the Court does find that the absence of any explicit denial of an oral agreement in Danks' declaration is

telling.  But the Court also notes that Rodgers bears the burden of proving an agreement existed, and he faces some difficult challenges.

For example, contrary to Poe's declaration, Danks declares that Lewis was *not* the attorney on the phone call on December 9, 2021, and the attorney on the phone call was *not* a supervisor of another attorney who worked on the investigation (Dkt. #48-1 ¶ 7).  These statements both directly contradict Poe's statements.  While the name of the Government attorney who made the alleged agreement might seem like a minor detail, it does cast doubt on Poe's "unequivocal[]" recollection of the events. *See United States v. Casares*, No. 2:14-653, 2019 WL 1243617, at *4 (S.D. Tex. Mar. 18, 2019) (singling out Defendant's failure to "specify with whom he entered into this alleged agreement" in holding no oral non-prosecution agreement existed).  Further, while Poe asserts an oral agreement was made, Danks declares that "[t]he Division's general practice is that both NDUs and NPAs are written" (Dkt. #48-1 ¶ 3).  Moreover, while Poe claims an oral non-prosecution was reached around December 9, 2020, Rodgers entered into a second written NDU with the Government after this that contained no mention of the oral agreement.  The execution of the written NDU not only reinforces the Government's claim that agreements like this are in writing, but it also indicates that the course of dealing between the parties was to put important agreements in writing.

Even more telling, the Court finds it odd that Poe's declaration does not mention that two written NDUs were executed.  And, finally, looking at Poe's declaration, the Court finds it noteworthy that when Poe was notified that the Government was now recommending prosecution, he never asserted that the change violated any alleged agreement. *See United States v. Sattar*, No. 02-CR-395, 2003 WL 22510398, *3 (S.D.N.Y Nov. 5, 2003) (noting that if a non-prosecution agreement had been reached then Poe's response upon learning of the indictment "should have

been an anguished howl of protest over the breach of the agreement.") (internal quotations omitted).

Nonetheless, even fully crediting Poe's declaration and assuming *arguendo* that Rodgers has demonstrated the factual aspect of the alleged agreement, the Court finds that no agreement was reached as a matter of law. *See Coe*, 695 F.3d at 320 ("Whether an agreement fails for indefiniteness is a question of law.").  Indeed, a contract is "legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations." *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 323 (5th Cir. 2006) (internal quotations omitted).  Stated differently, "when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." *Coe*, 695 F.3d at 320.  To determine whether essential terms were sufficiently settled to find a contract, "[c]ourts look not only at any relevant written agreements but also at the relationship of the parties, [and] their course of dealings . . . ." *APS Cap. Corp. v. Mesa Air Grp., Inc*., 580 F.3d 265, 272–73 (5th Cir. 2009).

Here, no legally enforceable agreement was reached because there was no "meeting of the minds" on all essential terms.  Even accepting Rodgers' Poe's declaration as the truth—"that Rodgers would not be charged if Rodgers continued to cooperate, which included testifying at trial"—the agreement nevertheless fails to contain essential terms. *See id*. at 272 ("[A]n agreement is not enforceable unless it resolves all essential terms and leaves no material matters open for future negotiation.").  Indeed, not every "meeting of the minds" is a contract.  The minds may not have met on essential terms.  When the parties leave an essential term open for future negotiation, there is no binding contract. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).  Here, the alleged agreement contains no mention of essential terms like "what level of

cooperation would be required of [Rodgers] in order for h[im] to satisfy the purported [non-prosecution] agreement [and] who would determine whether [Rodgers] had fulfilled [his] part of the [] agreement." *See United States v. Lua*, 990 F. Supp. 704, 711 (N.D. Iowa 1998); *see also Commonwealth v. Stewart*, No. 04-1409, 2004 WL 3455442, at *17 (Va. Cir. Ct. Oct. 22, 2004) (finding an absence of sufficient detail to prove a meeting of the minds).  Absent such essential terms, there could be no meeting of the minds.  That Rodgers now argues that he has lived up to his end of the agreement—by cooperating—and the Government disagrees illustrates how these details were material terms to the agreement.  Undeniably, these details could change the outcome of the case. *See United States v. Aleman*, 286 F.3d 86, 92 (2d. Cir. 2002) ("A critical factual element of the alleged agreement will be who determines [Defendant]'s truthfulness and willingness to testify-the government, the court, or some other party.").

Further, examining the written NDUs, the relationship of the parties, their course of dealings, and other evidence only confirms there was no meeting of the minds as to the essential terms of the non-prosecution agreement. *See Mesa*, 580 F.3d 272–73.  Indeed, when the agreement is oral, the court "must consider the possibility that immunity discussions . . . never progressed to a meeting of the minds and formation of an enforceable bargain." *Aleman*, 286 F.3d at 89.  That a final oral agreement was never reached is bolstered by the existence of two written NDUs.  These objectively show the course of dealing between the parties—when the parties agreed to final and essential terms of a contract, they did so in writing.  By contrast, the only evidence that Rodgers offers to show that an oral agreement was reached is subjective evidence—Poe's declaration.  But even Poe's declaration supports the conclusion that no final agreement was ever reached.  Indeed, Poe's repeated conversations with the Government indicate that there was a possibility a deal could be made in the future, not that a final agreement already existed as to all essential terms. *See Lua*,

990 F. Supp at 711.  For example, Poe acknowledges that he asked the Government about Rodgers' status several times.  However, if there had been a prior meeting of the minds on all essential terms, then Poe's inquiries would have been unnecessary. Thus, his repeated inquiries highlight that even he might have been unsure that there was a final agreement on the table.

In short, the Court finds that Rodgers has failed to prove that essential terms of the agreement were sufficiently settled and definite.  Indeed, the lack of detail regarding the terms of the alleged agreement highlight that the parties never reached a final agreement.  And a court may not create an agreement where none exists. *See Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex. App.—Dallas 2007, no pet.).  A defendant must establish something "more than an unfounded and unilateral belief" that the government made a claimed promise in exchange for his cooperation. *United States v. Williams*, 198 F.3d 988, 992 (7th Cir. 1999).  Rodgers has not done so.  Accordingly, because the Court concludes that there was no meeting of the minds as to the essential terms, the Court finds no non-prosecution agreement exists for the Court to enforce. Therefore, the Court denies Rodgers' motion to dismiss on this ground.

**CONCLUSION**

It is therefore **ORDERED** that Defendant Neeraj Jindal's Motion to Dismiss Count One of the First Superseding Indictment (Dkt. #36) and Defendant John Rodgers' Motion to Dismiss the Superseding Indictment (Dkt. #45) are hereby **DENIED.**

**IT IS SO ORDERED.**

**SIGNED this 29th day of November, 2021.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE